*710 BERNICE BOUIE DONALD, Circuit Judge,
dissenting.
Benji Stout is no Edmond Dantes, who famously escaped from prison by cutting open a body bag with an improvised knife and hiding in the bag, to be flung unknowingly into the sea by gravediggers. See Alexander Dumas, The Count of Monte Cristo 172-75 (David Coward ed., Oxford University Press 1990) (1845). Nor is he Andy Dufresne, who slowly chiseled his way to freedom and destroyed a sewer pipe in effectuating his escape. See The Shawshank Redemption (Castle Rock Entertainment 1994). I would have no quarrel with the conclusion that either of their escapes would be a “crime of violence” for our purposes today.
Instead, an unarmed Stout climbed a wall and crawled through a hole in a prison gate that he was not responsible for creating. Because the law and common sense compel me to fundamentally disagree with the majority’s conclusion that such acts are “crimes of violence,” I must respectfully dissent.
I.
Simply put, I disagree with the proposition that our decision in United States v. Ford, 560 F.3d 420 (6th Cir.2009), applies here today. The primary basis for my disagreement is this: we are dealing with an entirely different statute. Section 16 and the ACCA’s violent felony provision are separate legislative creatures, deserving of separate analyses.[1]
I begin at the place where all federal laws find their beginning: Congress. Our legislature selected § 16 as the basis for determining which violent crimes would serve as a predicate offense making the possession of body armor illegal. See H.R. Conf. Rep. 107-685 § 11009 (2002), 2002 U.S.C.C.A.N. 1120. By cross-referencing § 16, Congress sought to have the statute operate in tandem with existing drug-trafficking weapons possession statutes. See 18 U.S.C. § 924(c)(3) (2000). In doing so, it impliedly opted not to adopt another definition of “violent felony” that was already on the books — the ACCA’s. See 18 U.S.C. § 924(e)(2)(B) (2000). We must be mindful of the distinction that Congress drew when it eschewed one for the other. To conflate the two statutes, as the majority does today, is to disregard the careful contemplation the legislature undertook in writing the statute the way it did. Cf. Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).
Looking to the statutes themselves may be helpful in illustrating the difference between the two. Section 16 provides:
The term “crime of violence” means—
(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.
18 U.S.C. § 16 (2006) (emphasis added). In contrast, the violent felony provision of the ACCA provides, in pertinent part:
(B) the term “violent felony” means any crime punishable by imprisonment for a term exceeding one year ... that—
(i) has as an element the use, attempted use, or threatened use of *711 physical force against the person of another; or
(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another....
Id. § 924(e)(2) (emphasis added). I doubt anyone could validly posit that § 16(a) and § 924(e)(2)(B)(i) apply to section 520.030 of the Kentucky Revised Statutes, so I will proceed by discussing only § 16(b) and § 924(e)(2)(B)(ii).
I derive two points of significance in comparing the residual clauses of the two statutes. First, § 16(b) is temporally constrained, whereas § 924(e)(2)(B)(ii) is not: the substantial risk of physical force must arise “in the course of committing the offense.” In contrast, § 924(e)(2)(B)(ii) merely requires conduct “that presents a serious potential risk of physical injury to another.” Second, § 16(b) is contextually constrained in two ways: (a) the use of physical force must arise from the “course of’ committing the offense, i.e., in order to effectuate the offense; and (b) the person who may potentially use physical force must be the offender. Section 924(e)(2)(B)(ii) has neither facial constraint.[2]
These are not novel distinctions. This court has previously recognized that § 16(b) is constrained in a manner that the ACCA is not. See United States v. Amos, 501 F.3d 524, 527 (6th Cir.2007) (“The clause ‘used in the course of committing the offense,’ which does not appear in the ACCA, narrows the section 16(b) definition and distinguishes it from that in the ACCA.”). Indeed, my colleagues on the court, writing separately, have stressed the importance of distinguishing the two statutes. See id. at 530 (Batchelder, J., concurring) (“18 U.S.C. § 16 ... is not identical to [18 U.S.C. § 924(e)(2)(B)].”); id. at 531, 533-34 (McKeague, J., dissenting) (criticizing the reliance on Leocal and § 16 in an ACCA violent felony case).
On the surface, the majority appears to recognize that we are addressing a different statute, but its analysis suggests that it is paying little more than lip service to the nuances revealed by comparing both provisions. To make our otherwise-inapposite decision in Ford binding in a manner that comports with § 16, my colleagues rely on dicta from the Supreme Court’s decision in Leocal v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), the seminal case concerning § 16. They reiterate the Leocal Court’s observation that burglaries, by their nature, “involve[] a substantial risk that the burglar will use force against a victim in completing the crime.” Leocal, 543 U.S. at 10, 125 S.Ct. 377. They reason that “it is natural to infer a significant risk that the offender will be prone to use force against any person, or property, interfering with completion of [the escape].” (Maj. Op. at 709.) Because burglaries and jailbreaks share the common attribute of carrying some inherent risk that the perpetrator will use physical force, they are alike. Thus, Leocal can be used to sustain Ford’s obiter dicta that scaling a prison wall or climbing through a compromised security fence, as Stout did here, is a crime of violence. Or so the reasoning of the majority goes.
I do not share my colleagues’ confidence that the law supports such contortion. *712 First, the reliance on Leocal’s dicta on burglaries is misplaced — or at the very-least, out of context. A burglary, like certain other crimes, is categorically sui generis: it is one of several crimes that are so latent with the potentiality of harm that Congress, as well as the courts, have recognized them to be inherently violent crimes. To complete the reference in Leo-cal, it is helpful to look at the seminal ACCA violent-felony case: Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).
In Taylor, the Supreme Court, while analyzing the legislative history of the violent felony provision, made several “useful observations” to fill in the gaps of such history. One of these observations was the fact that an offender’s entry into a building “often creates the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate.” Id. at 588, 110 S.Ct. 2143. After careful review of what Congress had contemplated, the court concluded that the legislature believed “all burglaries serious enough to be punishable by imprisonment for more than a year constituted a category of crimes that shared this potential for violence.” Id. It was this careful intertwining of legislative history and judicial reasoning that likely led to the Leocal Court’s observation that burglary was a “classic example” of an inherently dangerous crime. See Leocal, 543 U.S. at 10, 125 S.Ct. 377. We have the benefit of neither to support the inference of inherence that the majority suggests with respect to escapes.[3]
Still, the lack of legislative history and extensive judicial commentary thereon does not definitively forbid the majority’s attempt to bridge Ford with Leocal using inherence as a foundational pier. For that, I turn to Ford itself. In that case, we disavowed our past circuit precedent in which we deemed all escape offenses to be crimes of violence. Ford, 560 F.3d at 423 (emphasis added). We surmised that, after Chambers, it was no longer “clear-cut.” Id. The impetus for our subdividing of the Kentucky statute was the concession that not all escapes possessed the inherent potentiality of harm that seems unquestionably latent in all of the categorically sui generis offenses such as burglary. In addition, the majority cannot reason that walkaways were the exception and that inherent harm should be categorically recognized for all other offenses; if that were true, we would not have sanctioned further mincing of the Kentucky escape statute. See id. at 424. Therefore, the bridgé between § 16 and § 924(e)(2)(B) is an illusory one.
II.
There is another aspect of the majority’s opinion that I find conflictive with circuit precedent: its invocation of the “unique intensity of a jailbreak scenario” to justify sustaining the “crime of violence” determination. The powder-keg reasoning, which we have eschewed even in the context of the ACCA, seems to have made a reappearance. My colleagues assert, in a somewhat eonclusory manner, that our decision today does not rest upon the buttress of the powder keg. I respectfully beg to differ. Indeed, the majority’s analysis seems to belie this assertion.
To justify its decision, the majority relies on cases from our sister circuits that explicitly invoke the verboten rationale of the powder keg. See United States v. *713 Hughes, 602 F.3d 669, 677 (5th Cir.2010) (“It was in this sense that we termed escape a ‘powder keg’ in [United States v.] Ruiz, [180 F.3d 675 (5th Cir.1999)] and now reaffirm our holding in that case.”); United States v. Pratt, 568 F.3d 11, 22 (1st Cir.2009) (“Therefore, the ‘powder keg’ rationale still applies to such a crime.”). Notwithstanding my colleagues’ protestations to the contrary, it appears that we are restocking the recently-emptied keg with fresh gunpowder. I, however, would prefer to remain steadfast to our own circuit’s decision to attribute “little, if any, continuing persuasiveness” to the powder-keg theory. See United States v. Anglin, 601 F.3d 523, 529 (6th Cir.2010).
III.
To illustrate why it is important to draw distinctions between § 16 and the ACCA, I now address Ford itself, particularly the passage that has led to my quandary today. In Ford, we opined that:
There is a difference between individuals who overcome physical barriers to freedom and those who walk off the grounds — those in other words who leave a facility without removing a physical restraint, without breaking a lock on a door, without climbing over a prison wall or security fence or without otherwise breaking through any other form of security designed to keep them put.
560 F.3d at 424 (emphasis added). I note that, since Ford, the Supreme Court held in Johnson v. United States, 559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), that violence under the ACCA and § 16 must “connote[ ] a substantial degree of force.” Id. at 1271. Keeping this in mind, it is not farfetched to say that climbing a wall or crawling through an open hole does not ordinarily involve a “substantial degree of force,” as Johnson requires. Thus, to deem such an escape “violent” for purposes of the ACCA, there must be some conduct outside of the climbing or crawling itself that must pose a “substantial risk” of the use of physical force against a person or property.
This is where the distinction between § 16 and the ACCA’s “violent felony” provision creates a deviation of disposition. It may very well be true, as the Ford court’s reliance on the Seventh Circuit’s decision in United States v. Templeton, 543 F.3d 378 (7th Cir.2008) suggests, that a wall-climbing inmate will “commit violent crimes such as murder or robbery against civilians while on the lam.” Ford, 560 F.3d at 424. It may also be true that a wall-climbing inmate is “significantly more likely than others to attack, or physically to resist,” law enforcement attempting to apprehend him and return him to the detention facility. Id. at 425. In the realm of the ACCA, it is perfectly acceptable to take these considerations into account, as the violent felony provision requires only that the conduct “present[ ] a serious potential risk of physical injury to another.” See 18 U.S.C. § 924(e)(2)(B)(ii).
Not so under § 16. As I explain above, that provision constrains us both temporally and contextually. For Stout, this means we should only consider the risk that arises from his escape standing alone, not the risk arising from events that may occur subsequent to his escape, including his apprehension. These limitations would not exist under the ACCA, which is why Ford’s dicta would be tenable in that context.
Moreover, the Ford decision undeniably rested on the broad swath of empirical evidence evaluated in Templeton. Undoubtedly, a small part of the Seventh Circuit’s reasoning in that case was based on the risk of harm that emanated during the escape. See Templeton, 543 F.3d at 382. That court observed from a 2005 *714 study that “8% of escapees commit violence against guards in the process of getting away.” Id. Indeed, our majority recognizes and relies upon this datum.
What my colleagues do not reveal, however, is the data that can permissibly be considered under the ACCA but not under § 16(b), in light of the latter’s statutory constraints — in other words, the core of what made Ford possible. Because § 16(b) requires that the risk arise from the “course of committing the offense,” we cannot look to facts like the “11% to 15% chance of violent resistance to recapture,” or the commission of “violent crimes such as murder or robbery against civilians while on the lam.” See id. at 381-82 (emphasis added). Once the crime is complete, a defendant is no longer “in the course of committing the offense,” and our inquiry of risk must end. Under Kentucky law, once an inmate goes beyond a secured perimeter, “his departure from the ‘detention facility’ [is] complete[ ].” Cope v. Commonwealth, 645 S.W.2d 703, 704 (Ky. 1983). When Stout stepped through the breach, his crime was complete; thus, we cannot rely on the other statistics made available by Templeton to sustain his conviction.
The majority, cognizant of this, invokes the lone statistic that we are permitted to consider: that a small percentage of non-walkaway escapees engage in violent conduct as they are in the process of escaping from the facility. See Templeton, 543 F.3d at 382. This statistic, however, does not distinguish between inmates who use physical force against persons in effecting their escape, cf. Ky.Rev.Stat. § 520.020, inmates who use physical force against property, see, e.g., Webster v. Commonwealth, No. 2008-CA000347-MR, 2009 WL 50495, at *1 (Ky.Ct.App. Jan. 9, 2009), and inmates who use neither. Put differently, we have one statistic which reveals that a fraction of all escapees have engaged in physical resistance in their respective attempts to illicitly obtain their freedom. Shrouded in such ambiguity, this seems inadequate to empirically support the proposition that Stout committed a crime of violence in the form of his escape. For this reason, Ford and its reliance on Templeton are not controlling here.
IV.
No dissent is complete without some explanation as to how the case should have been decided. I start with classification. The majority hints at the perplexing dilemma that this case presents: either attempt to fit the square peg of Stout’s offense into one of four previously-identified categories of escape recognized under the Kentucky escape statutes or recognize a new category of offenses that would further dissect Kentucky law. Picking the right label “makes all the difference.” See Ford, 560 F.3d at 424.
If there was ever an occasion to depart from Ford’s quadripartite categorization of the Kentucky escape statutes, this is it. Adopting a broad, sweeping categorization of Stout’s offense that declares his crime to be one of “leaving custody in a secured setting,” as the majority does, fails to capture the nuances of his offense that would otherwise suggest that his crime was not a violent one. I do acknowledge, however, that taking cognizance of a new offense category, viz. leaving custody in a compromised secured setting where the unarmed inmate was not the perpetrator of the breach, would put us in danger of endorsing the recognition of so many permutations of a single offense so as to render meaningless Taylor’s mandate that the *715 categorical approach be applied.[4]
But I do not think it farfetched to subdivide escapes from secured facilities into sub-classifications determined by an individual’s culpability in the compromising conduct. In Leocal, the Supreme Court explained that the focal point of the § 16(b) analysis is not “the possibility that harm will result from a person’s conduct, but ... the risk that the use of physical force against another might be required in committing a crime.” Leocal, 543 U.S. at 10, 125 S.Ct. 377. Because the word “use” in § 16 required “active employment,” the Court surmised that “a higher degree of intent than negligent or merely accidental conduct” was required as part of the offense. Id. at 9, 125 S.Ct. 377. From this, the Court concluded that § 16(b) requires some mens rea, higher than that required for negligence, that physical force will be used in some manner.
I would therefore draw a distinction between escapes from secured custody that require some degree of knowledge, intent, or recklessness with respect to the use of physical force and escapes from secured custody that lack such mens rea. Stout’s offense clearly falls into the latter category. There is a qualitative and categorical difference between Stout’s scaling of a wall and escape through an already-compromised barrier and a prisoner’s deliberate use of physical force to cause a breach in his escape. See, e.g., Webster, 2009 WL 50495, at *1 (recalling the events leading to a section 520.030 conviction in which an inmate “cut a hole in the chain-link fence,” using a “piece of steel that he had removed from the top of his cell door”). Stout certainly possessed the requisite mens rea to escape from prison, but to say that he exhibited an intent to use physical force to do so (or a reckless disregard thereof) by scaling a wall and crawling through an existing breach is another matter entirely.
After classifying Stout’s offense, I would faithfully adhere to Leocal’s central premise: for an offense to be a “crime of violence” under § 16(b), it must naturally fall within a “category of violent, active crimes.” 543 U.S. at 11, 125 S.Ct. 377. In its resolute focus on the “active” component of this analysis, the majority neglects the other half of Leocal: the crimes must be “violent.” We cannot, after all, “forget that we ultimately are determining the meaning of the term ‘crime of violence.’ ” Id.
Mindful of what Johnson said about “violence” — that it must involve “a substantial degree of force” — I cannot conclude that the manner of Stout’s escape posed a risk, much less a substantial risk, that he would exercise such a degree of force against the person or property of another to effectuate his escape. The only “force” that Stout applied against the property of another was the physical exertion necessary to scale a wall and exit through an already-existing breach of the secured facility. “In no ‘ordinary or natural’ sense can it be said that a person risks having to ‘use’ ” a substantial degree of force against the property of another in doing so. See id. at 11,125 S.Ct. 377.[5]
Nor could I conclude that Stout’s escape posed a “substantial risk” of a “substantial *716 degree of force” being used against the person of another. Because Stout was an unarmed escapee, I cannot think of a rationale other than the since-eschewed powder-keg theory that could sustain such a conclusion here. Certainly, had Stout sheathed an improvised weapon because he may have had to use it, as Dantes did, I would think differently. Nevertheless, this was not the case.
Thus, I discern no substantial risk from Stout’s offense that a substantial degree of physical force would be used against the person or property of another. I would therefore hold that Stout’s conviction under the Kentucky escape statute was not a “crime of violence” for purposes of § 16(b), and would reverse and remand with instruction to dismiss the indictment.
V.
If the law proves unpersuasive, perhaps common sense should prevail. See Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509, 557 (6th Cir. 2012) (noting the Supreme Court’s reliance on common sense in a commercial speech case and seeing fit to do the same). Here are the realities of our decision today. For climbing a wall and exiting through an open hole in a fence as an unarmed inmate-turned-escapee, Benji Stout is now deemed to have committed a crime of violence. We are essentially sustaining Stout’s conviction on a single line of dicta from a case that dealt with a different statutory scheme. Something is missing here — perhaps it is common sense.
The majority’s decision to rely on Ford is understandable. But it is also unreasonable. Relying on Ford is tantamount to blind obeisance to a case that simply does not compel it. The concept of dicta is a dangerous thing, and it is Stout who suffers for it. See Alexander v. Baltimore Ins. Co., 8 U.S. (4 Cranch) 370, 379, 2 L.Ed. 650 (1808) (“It is extremely dangerous to take general dicta upon supposed cases not considered in all their bearings, and, at best, inexplicitly stated as establishing important law principles.”).
What troubles me the most, however, is the reality that we are upholding Stout’s conviction on a single statistic: that 8% of escapees commit violence against guards in the process of getting away. We must be mindful of our longstanding legal maxim that “probability is not a guide which a court, in construing a penal statute, can safely take.” United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 105, 5 L.Ed. 37 (1820). It appears that we disregard this maxim today.
For these reasons, I regretfully cannot join my colleagues in the majority and must respectfully dissent.

. I do not mean to suggest that a defendant, under the ACCA, would be responsible for the serious potential risk of physical injury to another posed by another, e.g., a police officer wounding an innocent bystander in an attempt to apprehend an escaped inmate who used improvised tools to effectuate his escape. I am merely comparing the face of the two statutes.

. As I explain below, the "powder keg" rationale is unconvincing and foreclosed by circuit precedent.

. It appears, however, that we have not shied away from such a multitudinous approach in other contexts. See, e.g., United States v. Kratt, 579 F.3d 558, 563 (6th Cir.2009) (adopting an approach requiring interpretation of 250 different predicate offenses for the money laundering statutes but nevertheless recognizing the “unsatisfying” nature of the approach).

. I would find the degree of force used here akin to the degree of force that a walkaway might use to open a gate, jump over a ditch, or hop across a small stream.