[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14724

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00071-CR-DHB-WLB-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHAWNTRAIL J. LEE,
a.k.a. Billy Darkside,
a.k.a. Jathen Lee,
a.k.a. Jermaine Wilder,
a.k.a. Shawn Lee,
a.k.a. Rahshaun Frost,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 26, 2009)

Before EDMONDSON, BIRCH and COX, Circuit Judges.

BIRCH, Circuit Judge:

Shawntrail Lee appeals his conviction for being a felon in possession of a firearm. He asserts that the district court erred in denying his motion to suppress the gun that was found in his co-defendant's car and abused its discretion in denying his motion for a new trial based upon allegedly improper jury instructions. Lee further challenges his 180-month sentence on the grounds that the district court erred in finding that his prior convictions under New Jersey law for conspiracy, eluding a police officer, and escape were violent felonies under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). We conclude that Lee lacks standing to contest the search that led to the discovery of the gun and that his challenge to the district court's denial of his motion for a new trial is without merit. Accordingly, we AFFIRM his conviction. However, because Lee's prior conviction for a "walkaway" escape is not a "violent felony" under § 924(e)(2)(B)(ii) of the ACCA, a matter of first impression after the Supreme Court's decision in Chambers v. United States, ___ U.S. ___, 129 S. Ct. 687 (2009), we VACATE his sentence and REMAND to the district court for resentencing.

## I. BACKGROUND

A federal grand jury returned an indictment against Lee and his co-

2

defendant Rashon Jackson, charging them with being felons in possession of a firearm, in violation of 18 U.S.C. § 922(g). The indictment alleged that Lee previously had been convicted for, <u>inter alia</u>, attempting to elude the police, conspiracy to commit robbery, and escape, all felonies under New Jersey law. The government submitted a penalty certification, providing that Lee was subject to the statutory mandatory minimum sentence of fifteen years of imprisonment under 18 U.S.C. § 924(e). Lee subsequently stipulated that he was "a convicted felon as charged in the indictment." R1-67.

A.    <u>Motion to Suppress</u>

Prior to trial, Lee moved to suppress the firearm that was discovered in the glove compartment of Jackson's Lexus on the grounds that the search of the vehicle was conducted without consent, probable cause, or a warrant, in violation of the Fourth Amendment. The magistrate judge ordered Lee to file an affidavit demonstrating that he had a legitimate expectation of privacy in the property searched. In his affidavit, Lee stated, <u>inter alia</u>, that the Lexus "was in the possession of Rashon Jackson." R1-36 at 1.

At the suppression hearing, Deputy David Wheeler, an agent with the Columbia County Sheriff's Department ("CCSD"), testified that on 24 June 2007, the CCSD received a call from the Lincoln County Sheriff's Department

3

("LCSD") in reference to a possible shooting that had occurred in Lincoln County. According to LCSD officials, shots had been fired at a residence from a white Lexus with spoked rims and New Jersey tags. Deputy Wheeler's unit was advised to "be on the lookout" for the vehicle, which LCSD officials believed was heading into Columbia County on Washington Road. LCSD officials also advised that there were two black males in the vehicle.

Deputy Wheeler stated that he was traveling on Washington Road when he received the call from dispatch and pulled into a convenience store at the intersection of Washington Road and William Few Parkway. Approximately two or three minutes later, a white Lexus matching the description of the suspect vehicle arrived at the store and pulled up to a gas pump. Jackson was driving, Lee was in the front passenger seat, and a black female, identified as a "Ms. Malone," was in the back seat. Lee and Malone went inside the store while Jackson pumped gas. When Lee and Malone returned to the car, Deputy Wheeler and the officers who had arrived on the scene approached the suspects to question them about the shooting. Both Jackson and Lee denied that there were any weapons or drugs in the car and refused to consent to a search of the car. When a check of Jackson's license revealed that it was suspended, Jackson was arrested and placed in the back of one of the patrol cars. Incident to Jackson's arrest, the officers searched

4

the car but found no contraband or other evidence of criminal activity.

At that point, Deputy Wheeler called for a wrecker to come and remove the vehicle because Lee and Malone had been drinking that night and were unable to drive. Deputy Wheeler testified that police department policy required the officers to conduct an inventory of the vehicle, which included "go[ing] through the car and mak[ing] . . . a list of everything that's in the car," before turning it over to the wrecker service. R2 at 7. Pursuant to this routine inventory search, the officers found a loaded .40 caliber Ruger pistol in the locked glove compartment. Deputy Wheeler recalled that the barrel of the gun was still warm to the touch, indicating that it had recently been fired several times. Lee was then placed under arrest and taken into custody.

The magistrate judge issued a report and recommendation finding that: (1) the officers were justified in detaining and questioning Lee, Jackson, and Malone, because they had a reasonable suspicion, based on particularized and articulable facts, that the Lexus was involved in the Lincoln County shooting; (2) the officers had probable cause to arrest Jackson after discovering that his license was suspended; (3) the impoundment of the Lexus was reasonable under the circumstances; and (4) the inventory search of the vehicle, conducted subsequent to its authorized impoundment and pursuant to standard police procedure, was

5

lawful. Overruling Lee's objections, the district court adopted the magistrate's report and recommendation and denied Lee's motion to suppress the firearm.

B.     Jury Instructions

Following a one day trial, the district court instructed the jury on, inter alia, its obligation to follow the court's instructions as a whole and consider all of the evidence, the government's burden of proof, and the elements of the felon-in-possession offense. During its deliberation process, the jury directed the following question to the court: "There are some that are completely confused [as] to what the evidence, hearsay and the law is. Please help us. Can you talk about what you can consider and what you can't. Help please." R3 at 138. After conferring with the parties on how to respond, the court called the jury back in and repeated many of its former instructions regarding the elements of the offense and the reasonable doubt standard. With respect to the elements of the offense, the court reminded the jury that the government had to prove that Lee (1) "knowingly possessed a firearm . . . in or [a]ffecting interstate commerce" and (2) previously had been convicted of a felony offense. Id. at 142. The court advised the jury that because Lee had stipulated that he was a convicted felon as charged in the indictment and there was no dispute that the firearm had traveled in interstate commerce, the only determination it needed to make was whether Lee "knowingly

6

possessed" the firearm.  Id. at 142-43.  The court stated that "knowingly" meant

"voluntarily and intentionally and not because of mistake or accident" and

explained "possession" as follows:

>         A person may have actual possession or constructive
> possession . . .   A person who knowingly has direct, physical control
> over something is then in actual possession of it.  I'm holding this
> ruler in my hand so there is no question that I am in actual, physical
> possession of it.
>         A person who is not in actual possession, but who has the
> power and the intention to later take control of something either alone
> or together with someone else is in constructive possession of that
> item.  Obviously, I'm holding up my car keys or I should say the keys
> to my life because this set of keys unlocks everything I own . . . .    I
> am not holding my car and I am not . . . near my truck, but I have the
> power and the intention to later take control of my car and I will use
> these keys to do so.  So, I am in constructive possession over all of
> those items.

Id. at 140-41.

The court next addressed the jury's reference to hearsay, stating that while

there may have been one objection to the testimony at trial on hearsay grounds,

"there is no hearsay in this case."  Id. at 145.  The court informed the jury that

"[e]verything [it] heard, every word [it] heard uttered by the witnesses . . . was

testimony," and that "there [was] no hearsay before [it]."  Id. at 145-46.

After excusing the jury, defense counsel advised the court that while he

believed the court's instructions constituted "a correct statement of the law," he

7

was concerned that they "overly emphasize[d]" the elements of the offense. Eleven minutes later, the jury returned with a guilty verdict. Lee subsequently moved for a new trial, asserting, inter alia, that he "was prejudiced by the Court's answer and responses to the Jury's question about hearsay." R1-75. Finding no bases for setting aside the jury's guilty verdict, the court denied the motion.

## C.  Sentencing

The probation officer who prepared Lee's pre-sentence investigation report ("PSI") calculated Lee's base offense level at 33 after determining that Lee had three violent felony convictions and thus was an armed career criminal subject to the statutory mandatory minimum sentence of fifteen years of imprisonment under 18 U.S.C. § 924(e). See U.S.S.G. §§ 4B1.4 (a), (b)(3)(B) (Nov. 2008); 18 U.S.C. § 924(e)(1). She assigned Lee a criminal history category of VI, which, together with an offense level of 33, yielded an applicable guideline range of 235-293 months of imprisonment.

The probation officer provided the following information with respect to Lee's three prior convictions. First, the probation officer stated that Lee had been convicted for eluding police officers in the second degree after he refused to pull

over his car, crashed into a median, and fled from the vehicle on foot.[1]  Second,

the probation officer explained that Lee's conspiracy conviction was for

conspiracy to commit armed robbery.  Relying on unspecified records, the

probation officer described Lee's involvement in an attempted armed robbery of a

residential apartment.  Third, the probation officer stated that Lee's escape

conviction was based on his leaving a halfway house, but the PSI did not indicate

whether this offense was committed in the second or third degree or whether it

involved violence.

Lee filed written objections to the PSI and at sentencing argued, inter alia,

that his conviction for escape under N.J.S.A. § 2C:29-5 was not a violent felony

because it did not involve any kind of force or violence.  The district court found

that all three of Lee's convictions qualified as violent felonies and overruled Lee's

objections.  With respect to his escape conviction, the court noted that a "walk-

away or a slip-away from a halfway house . . . ha[d] been determined to be a crime

of violence by appropriate judicial authority."  R4 at 25.  The district court

ultimately granted Lee a downward variance under the factors in 18 U.S.C.

§ 3553(a) and sentenced him to the statutory mandatory minimum sentence of 180

---

[1] Lee also had been convicted in 1995 for eluding law enforcement in the third degree.
The probation officer did not rely on this conviction in determining that Lee had three prior
violent felony convictions for purposes of 18 U.S.C. § 924(e)(1).

months of imprisonment.

## II. DISCUSSION

On appeal, Lee raises three primary arguments: (1) the district court erred in denying his motion to suppress the firearm found in Jackson's car on the grounds that the search violated the Fourth Amendment; (2) the district court abused its discretion in denying his motion for a new trial; and (3) the district court erred in sentencing him as an armed career criminal under 18 U.S.C. § 924(e). We address each argument in turn.

A.    Denial of Motion to Suppress

"In reviewing a district court's denial of a motion to suppress, we review the findings of fact for clear error and the application of law to those facts de novo." United States v. Mercer, 541 F.3d 1070, 1073-74 (11th Cir. 2008) (per curiam), cert. denied, ___ U.S. ___, 129 S. Ct. 954 (2009).

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. It is well-established, however, that only individuals who have a legitimate expectation of privacy in the area invaded may invoke the protections of the Fourth Amendment. Smith v. Maryland, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580 (1979); see also United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987) (per curiam) ("Rights secured by the Fourth Amendment are personal and

10

cannot be vicariously asserted.").

We have held that a "passenger[] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam) (citing Rakas v. Illinois, 439 U.S. 128, 140, 143 n.12, 148, 99 S. Ct. 421, 429, 430 n.12 (1978)); see also United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it."). In this case, there is no dispute that Jackson, not Lee, was the driver and owner of the vehicle that was searched. Inasmuch as Lee asserted no property or possessory interest in the Lexus, he has failed to meet his burden of establishing a legitimate expectation of privacy in the glove compartment in which the gun was discovered. See Rakas, 439 U.S. at 140, 148-49, 99 S. Ct. at 429, 433 (passengers occupying a car they neither owned nor leased had no legitimate expectation of privacy in the glove compartment or area under the seat of the car because, "[l]ike the trunk of an automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy"). Accordingly, Lee's Fourth Amendment claim must fail.

B.    Motion for New Trial

We review for an abuse of discretion the district court's denial of a request for a new trial. United States v. Hunt, 526 F.3d 739, 744 n.1 (11th Cir. 2008). We review the legal correctness of a jury instruction de novo and the district court's phrasing for an abuse of discretion. United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). Because "district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts, . . . we will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." Id. (quotation marks and citation omitted); see also United States v. Svete, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc) (noting that reversal is warranted only if this court is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations" (quotation marks and citation omitted)).

Lee argues that the district court erred in failing to grant him a new trial because its supplemental instructions to the jury were unduly coercive and amounted to an abuse of discretion. He asserts that although the jury merely asked a question about hearsay, the court recharged the jury on the elements of possession, provided personal examples of possession, and used the weapon

12

involved to illustrate its point. An instruction may be impermissibly coercive if it "give[s] a jury no choice but to return a verdict," United States v. Jones, 504 F.3d 1218, 1219 (11th Cir. 2007) (per curiam), or if it "suggest[s] that a particular outcome was either desired or required," United States v. Prosperi, 201 F.3d 1335, 1341 (11th Cir. 2000).

We first note that the premise of Lee's argument is incorrect because, as the government points out, the jury's question did not refer only to hearsay. Rather, the jury asked the court to provide further guidance as "to what the evidence, hearsay and the law is." R3 at 138. The court was thus free to recharge the jury on the applicable law, including the elements of the offense. Moreover, although the district judge used his own ruler and car keys to demonstrate for the jury the concepts of actual and constructive possession, we fail to see how these personal examples misled the jury or amounted to an abuse of discretion, especially when, as Lee concedes, the court's instructions constituted an accurate statement of the law.[2] Accordingly, the district court did not abuse its discretion in denying Lee's motion for a new trial based on its instructions to the jury.

C. Sentencing

---

[2] There is no support in the record for Lee's assertion that the district judge picked up the firearm or used it to illustrate the concept of possession.

13

Lee challenges his sentence as an armed career criminal on the grounds that the district court erred in finding that his prior New Jersey convictions for eluding, escape, and conspiracy were violent felonies under the ACCA, 18 U.S.C. § 924(e)(2)(B). We review de novo the district court's determination that a particular conviction qualifies as a violent felony for purposes of the ACCA. United States v. Matthews, 466 F.3d 1271, 1273 (11th Cir. 2006).

*Escape Conviction*

Lee argues that his conviction for escape in the third degree based on his leaving a halfway house was not a violent felony because the statute under which he was convicted did not have as an element actual violence or the threat of violence and because the conduct underlying the offense did not involve any purposeful, violent, or aggressive conduct, as required by Begay v. United States, 553 U.S.___, ___, 128 S. Ct. 1581, 1586-88 (2008).

Although the government initially responded that Lee's escape conviction was a violent felony under our holdings in United States v. Taylor, 489 F.3d 1112 (11th Cir. 2007) (per curiam), vacated, Taylor v. United States, ___ U.S. ___, 129 S. Ct. 990 (2009), and United States v. Gay, 251 F.3d 950, 954 (11th Cir. 2001) (per curiam), it submitted a letter of supplemental authority following the Supreme Court's decision in Chambers, advising this court of its intention to abandon its

14

pre-Chambers position. The government concedes that, after Chambers, a walkaway escape is not a violent felony or a crime of violence and asks this court to remand the case to the district court for resentencing. Because the government's concession with regard to Lee's escape conviction is not dispositive, see Roberts v. Galen of Va., Inc., 525 U.S. 249, 253, 119 S. Ct. 685, 687 (1999) (per curiam), we must determine as a matter of first impression in this circuit whether a non-violent "walkaway" escape is a violent felony for purposes of the ACCA. We conclude that it is not.

A defendant convicted of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) is ordinarily subject to a statutory mandatory maximum sentence of ten years' imprisonment. See 18 U.S.C. § 924(a)(2). Where a defendant has three prior "violent felony" convictions, however, he is subject to a statutory mandatory minimum of fifteen years' imprisonment as an "armed career criminal." 18 U.S.C. § 924(e)(1); see U.S.S.G. § 4B1.4(a). The prosecution bears the burden of proving that a sentencing enhancement under the ACCA is warranted. United States v. Harrison, 558 F.3d 1280, 1294 n.24 (11th Cir. 2009).

The ACCA defines a "violent felony" as:

> any crime punishable by imprisonment for a term exceeding
> one year . . . that –
> (i) has as an element the use, attempted use, or threatened use

of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B). Where a crime does not fit within (i) or the first clause of (ii), the court must determine whether the crime comes within (ii)'s residual clause, that is, whether it "otherwise involves conduct that presents a serious potential risk of physical injury to another." In making this determination, courts employ the "categorical approach," under which they may "look only to the fact of conviction and the statutory definition of the prior offense" and must "consider whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender." James v. United States, 550 U.S. 192, 202, 127 S. Ct. 1586, 1593-94 (2007) (quotation marks, alterations, and citations omitted).[3]

When determining whether a state crime not enumerated in § 924(e) falls within the residual provision, courts "look[] to the particular state statute to supply

---

[3] Where the judgment of conviction and the statute are ambiguous, however, such that the district court is unable to determine whether the prior conviction qualifies as a violent felony, the district court may look to the facts underlying the state conviction. See United States v. Aguilar-Ortiz, 450 F.3d 1271, 1273 (11th Cir. 2006). "In examining the facts underlying a prior conviction to determine whether it qualifies for a sentencing enhancement, . . . sentencing courts may rely only on . . . the charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. at 1273-74 (quotation marks, citation, and footnote omitted).

16

the elements of the relevant crime." Harrison, 558 F.3d at 1285. Before Begay,

this inquiry focused exclusively on the degree of risk posed by violation of the

state statute. See id. Under this approach, any crime that posed a serious risk of

harm would come within the ACCA's residual provision and thus qualify as a

violent felony. See id. at 1286 (noting that "the serious potential risk of injury"

posed by a crime alone "would have been enough to qualify [as a violent felony]

under James"). Thus, we held in Gay that escape, even a peaceful "walkaway"

escape, was a crime of violence for purposes of the career-offender designation

under U.S.S.G. § 4B1.2 because it always posed a serious potential risk of

physical injury. See Gay, 251 F.3d at 954-55. Based on our reasoning in Gay, we

subsequently held in Taylor that the defendant's non-violent failure to return to a

halfway house was categorically a violent felony under the ACCA. See Taylor,

489 F.3d at 1114. Before Begay and Chambers, all of the circuits, with the lone

exception of the Ninth Circuit, also held that all escapes were crimes of violence

and/or violent felonies under § 4B1.2(a) and § 924(e)(2)(B)(ii), respectively.[4]

_____

[4] See, e.g., United States v. Winn, 364 F.3d 7, 12 (1st Cir. 2004); United States v. Thomas, 361 F.3d 653, 660 (D.C. Cir. 2004); United States v. Luster, 305 F.3d 199, 202 (3d Cir. 2002); United States v. Jackson, 301 F.3d 59, 62-63 (2d Cir. 2002); United States v. Franklin, 302 F.3d 722, 724 (7th Cir. 2002); United States v. Nation, 243 F.3d 467, 472 (8th Cir. 2001); United States v. Springfield, 196 F.3d 1180, 1185 (10th Cir. 1999); United States v. Ruiz, 180 F.3d 675, 676-77 (5th Cir. 1999); United States v. Harris, 165 F.3d 1062, 1068 (6th Cir. 1999); United States v. Hairston, 71 F.3d 115, 117-181 (4th Cir. 1995). Declining to join the majority of circuits, the Ninth Circuit rejected this "powder keg" rationale and held that the defendant,

17

As we noted in <u>Harrison</u>, <u>Begay</u> added a new requirement to the violent felony analysis. <u>Harrison</u>, 558 F.3d at 1286. The question before the Court in <u>Begay</u> was whether a prior conviction for driving under the influence ("DUI") is a violent felony within the meaning of § 924(e)(2)(B)(ii). <u>See</u> <u>Begay</u>, 553 U.S. at ___, 128 S. Ct. at 1583. The Court first held that under the ACCA's residual provision it is not enough that the crime pose a serious potential risk of injury; to qualify as a violent felony, the crime must be "roughly similar, in kind as well as in degree of risk posed, to the examples themselves." <u>Id.</u> at ___, 128 S. Ct. at 1585. The Court reasoned that the presence of the enumerated crimes in (ii) – burglary, arson, extortion, and crimes involving explosives – "indicates that the statute covers only *similar* crimes, rather than *every* crime that presents a serious potential risk of physical injury to another." <u>Id.</u> at ___, 128 S. Ct. at 1584-85. (quotation marks and citation omitted). Accordingly, although a DUI offense manifestly poses a serious risk of harm, the Court held that it is not a violent felony because "[i]t is simply too unlike the provision's listed examples for [the Court] to believe that Congress intended the provision to cover it." <u>Id.</u> at ___, 128

_____

who left an unsecured facility with permission to attend a drug treatment program, had not been convicted of a "crime of violence" for purposes of § 4B1.2(a). <u>See</u> <u>United States v. Piccolo</u>, 441 F.3d 1084 (9th Cir. 2006). The court reasoned that not every escape is a crime of violence because "[w]hile an escapee who flees a secured facility or the custody of an armed guard presents a serious risk of injury to himself and others, the same cannot be said for an escapee who leaves a halfway house with permission and fails to return." <u>Id.</u> at 1089.

18

S. Ct. at 1584. Whereas DUI "criminaliz[es] conduct in respect to which the offender need not have had any criminal intent at all," burglary, arson, extortion, and crimes involving the use of explosives all "typically involve purposeful, violent, and aggressive conduct" and "are characteristic of the armed career criminal, the eponym of the statute." Id. at ___, 128 S. Ct. at 1586-87 (quotation marks and citations omitted).

In the wake of Begay, then, courts must determine not only whether a non-enumerated state crime poses a serious potential risk of harm, but also whether it is similar in kind to the ACCA's enumerated crimes, i.e., whether it involves purposeful, violent, and aggressive conduct. A crime that does not involve such conduct is not a "violent felony" under the ACCA's residual provision, regardless of the degree of danger it presents. See id. at ___, 128 S. Ct. at 1588.

Decided less than a year after Begay, Chambers addressed whether a "failure to report" for penal confinement, in violation of an Illinois statute that criminalized various types of escape,[5] was a violent felony under the ACCA. See

---

[5] The Illinois statute grouped together in a single numbered statutory section, but separately described, several different kinds of behavior: "(1) escape from a penal institution, (2) escape from the custody of an employee of a penal institution, (3) failing to report to a penal institution, (4) failing to report for periodic imprisonment, (5) failing to return from furlough, (6) failing to return from work and day release, and (7) failing to abide by the terms of home confinement." Chambers, 129 S. Ct. at 691 (citing Ill. Comp. Stat., ch. 720, § 5/31-6(a)). The defendant had pleaded guilty to "knowingly failing to report for periodic imprisonment to . . . County Jail." Id. at ___, 129 S. Ct. at 691 (quotation marks, alterations, and citation

19

<u>Chambers</u>, ___ U.S. at ___, 129 S. Ct. at 689. Answering this question in the negative, the Court first ruled that failures to report and escapes from custody, though sometimes grouped together within a single criminal statute, do not belong to the same category of crime for purposes of the violent felony determination because "[t]he behavior that likely underlies a failure to report would seem less likely to involve a risk of physical harm than the less passive, more aggressive behavior underlying an escape from custody." <u>Id.</u> at ___, 129 S. Ct. at 691. Having determined that escape from custody and failure to report are two separate and distinct crimes, the Court held that the offense of "failure to report" does not fall within § 924(e)(2)(B)(ii)'s residual clause because "it does not involve conduct that presents a serious potential risk of physical injury to another." <u>Id.</u> at ___, 129 S. Ct. at 691 (quotation marks and citation omitted). The Court observed that a failure to report "amounts to a form of inaction, a far cry from the purposeful, violent, and aggressive conduct potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or residence, or engages in certain forms of extortion." <u>Id.</u> at ___, 129 S. Ct. at 692 (quotation marks and citation omitted).[6]

_____

omitted).

[6] The Court's conclusion that the conduct underlying a failure to report does not present a serious potential risk of physical injury to another was based in part on statistical data contained

20

Although <u>Chambers</u> does not address walkaway escapes, it nevertheless is significant to our analysis in this case because in establishing that a failure to report or failure to return is not a violent felony under the ACCA, it "rejects the notion that all escapes are created equal." <u>Harrison</u>, 558 F.3d at 1294; <u>see also</u> <u>United States v. Charles</u>, ___ F.3d ___ , No. 08-3212, 2009 WL 2436663, at *7 (10th Cir. Aug. 11, 2009) (concluding that <u>Chambers</u> compelled a modification of Tenth Circuit precedent that all escape convictions are crimes of violence under U.S.S.G. § 4B1.1); <u>United States v. Pratt</u>, 568 F.3d 11, 21 (1st Cir. 2009) (concluding that <u>Chambers</u> "eroded [the court's prior holding] that all escape crimes should be treated equally under [the] categorical approach to analyzing predicate crimes"); <u>United States v. Ford</u>, 560 F.3d 420, 423 (6th Cir. 2009) (concluding that <u>Chambers</u> required modification of prior decisions "suggesting that all manner of escape convictions . . . constitute crimes of violence"). In revisiting the issue, several of our sister circuits have overruled their prior

---

in the Sentencing Commission's "Report on Federal Escape Offenses in Fiscal Years 2006 and 2007," which identified every federal case in 2006 or 2007 in which a federal sentencing court applied the "Escape, Instigating or Assisting Escape," guideline, U.S.S.G. § 2P1.1 (Nov. 2008), and calculated "the likelihood that violence would accompany commission of the escape or the offender's later apprehension." <u>Id.</u> at ___, 129 S. Ct. at 692. The report found that out of 160 failure to report cases, "none at all involved violence – not during commission of the offense itself, not during the offender's later apprehension – although in 5 instances (3.1%) the offenders were armed." <u>Id.</u> at ___, 129 S. Ct. at 692. According to the Court, this information "strongly support[ed] the intuitive belief that failure to report does not involve a serious potential risk of physical injury." <u>Id.</u> at ___ 129 S. Ct. at 692.

precedents and concluded that walkaway escapes are no longer properly classifiable as violent felonies under the ACCA or crimes of violence under the Sentencing Guidelines in the aftermath of <u>Chambers</u> and <u>Begay</u>.

For example, in <u>United States v. Hopkins</u>, ___ F.3d ___, No. 06-5091, 2009 WL 2579611 at *8 (3d Cir. Aug. 21, 2009), the Third Circuit held that the defendant's prior conviction for violating a Pennsylvania escape statute was not a conviction for a "crime of violence" within the meaning of U.S.S.G. § 4B1.2.[7] That escape statute provides, in pertinent part, that "[a] person commits an offense if he unlawfully removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period."  18 Pa. Cons. Stat. Ann. § 5121(a).  The statute further defines a third degree offense as one in which "(i) the actor was under arrest for or detained on a charge of felony or following conviction of crime; (ii) the actor employs

_____

[7] U.S.S.G. § 4B1.2 defines a "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that –

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

Cases interpreting "crime of violence" for purposes of career-offender status under U.S.S.G. § 4B1.1 provide important guidance in determining what is a "violent felony" under 18 U.S.C. § 924(e)(2)(B)(ii) "because the definitions for both terms are virtually identical." <u>United States v. Rainey</u>, 362 F.3d 733, 735 (11th Cir. 2004) (per curiam).

22

force, threat, deadly weapon or other dangerous instrumentality to effect the escape; or (iii) a public servant concerned in detention of persons convicted of crime intentionally facilitates or permits an escape from a detention facility." Id. § 5121(d)(1). Any other offense under this section is classified as a second degree misdemeanor. Id. § 5121(d)(2). A second degree misdemeanor under the statute is punishable by a maximum term of two years of imprisonment. Id. § 1104(2).

The court first categorized Hopkins' crime of conviction as "unlawfully removing himself from arrest on a misdemeanor charge without employing force, threat, deadly weapon or other dangerous instrumentality." Hopkins, ___ F.3d at ___, 2009 WL 2579611, at *6 (quotation marks, alterations, and citation omitted). The court next determined that, in the ordinary case, this crime did not pose "a degree of risk of physical injury to another similar to that posed by burglary, arson, extortion, or the other offenses enumerated in U.S.S.G. § 4B1.2(a)." Id. Further, the court found, "an ordinary case falling within the crime of conviction is not 'similar in kind' to the enumerated offenses." Id. The court reasoned that although an escape from custody is purposeful conduct, the escape crime for which Hopkins was convicted requires no "force, threat, deadly weapon or other dangerous instrumentality," and therefore involves "conduct materially less violent and aggressive than the enumerated offenses." Id. (quotation marks

23

omitted).

The Sixth Circuit has similarly held that escape under a Kentucky statute that is virtually identical in all material respects to the New Jersey statute at issue in this case is not a "crime of violence" under U.S.S.G. § 4B1.2(a). See Ford, 560 F.3d at 426. The Kentucky statute under which Ford had been convicted differentiates between first-degree escape, which covers "escapes from custody or a detention facility by the use of force or threat of force against another person," Ky. Rev. Stat. § 520.020(1), and second-degree escape, which "covers any other escape from a detention facility or escape from custody by an individual charged with or convicted of a felony," Ford, 560 F.2d at 422 (quotation marks and citation omitted); see Ky. Rev. Stat. § 520.030. Ford had been convicted of second-degree escape under this latter provision.

Acknowledging that Chambers involved a failure to report and not a walkaway escape, the court nevertheless found that Chambers "undermine[d] the notion that a 'walkaway' conviction is a crime of violence" and reasoned that if failures to report to custody represent a distinct form of escape after Chambers, then so, too, do walkaways. Ford, 560 F.3d at 423-24 (noting that after Chambers, "a 'walkaway' is a meaningfully distinct and meaningfully distinguishable category of escape as a matter of federal law"). Applying Begay, the court first

24

found that a walkaway "does not present the *risk* of physical injury to others that the listed crimes of violence do." Id. at 424. Unlike the prototypical escape scenario in which an individual must overcome physical barriers, a walkaway escape involves simply "leav[ing] a facility without removing a physical restraint, without breaking a lock on a door, without climbing over a prison wall or security fence or without otherwise breaking through any other form of security designed to keep them put." Id. Further, the court observed, an individual who simply walks away from custody was just as unlikely as an individual who fails to report to custody "to call attention to his whereabouts by simultaneously engaging in additional violent and unlawful conduct." Id. at 425 (quotation marks and citation omitted).

The court then found that walkaway escape offenses "do not involve the same *type* of purposeful, violent, and aggressive conduct that the listed crimes of violence do." Id. (quotation marks and citation omitted). It concluded that "[i]f driving under the influence (Begay) and a failure to report or return to prison (Chambers) are not sufficiently 'purposeful, violent, and aggressive' to satisfy this requirement, neither is a walkaway offense." Id.

Writing without the benefit of Chambers, the Seventh Circuit also has held that a walkaway escape in violation of a Wisconsin statute is not a crime of

25

violence for purposes of U.S.S.G. § 4B1.2 after <u>Begay</u>. See <u>United States v. Templeton</u>, 543 F.3d 378, 383 (7th Cir. 2008). The statute at issue in <u>Templeton</u> made it a crime to "intentionally escape[] from custody." <u>Id.</u> (quoting Wis. Stat. § 946.42). It defined "escape" as "leav[ing] in any manner without lawful permission or authority" and "custody" to include "the constructive custody of persons placed on supervised release or temporarily outside the institution whether for the purpose of work, school, medical care, . . . or otherwise." <u>Id.</u> (alterations and citation omitted). Thus, an escape offense under this statute includes both failing to report or return to custody and leaving unsupervised confinement (a "walkaway" escape). <u>Id.</u>

Comparing burglary to walkaway escape, the court acknowledged that "in both cases injuries may follow confrontations," but pointed out that "<u>Begay</u> requires similarities *other* than risk of injury," to wit, it "requires the crime to be aggressive or violent." <u>Id.</u> Like a simple failure to report to custody, a walkaway escape "do[es] not involve 'aggressive' conduct against either a person (as in extortion) or property (arson)." <u>Id.</u> The court further noted that although both burglary and walkaway escape require intent as an element, this did not render them "similarly violent." <u>Id.</u> Burglary, the court reasoned, involves two intents – "the intent to enter a building *and* the intent to commit a crime once inside"; it is

26

this second intent that makes burglary "purposeful, violent, and aggressive *in all cases*." Id. (emphasis added) (quotation marks omitted). To violate the Wisconsin escape statute, on the other hand, all an escapee need do is leave; he need not engage in any "violent or aggressive act." Id. Thus, unlike burglary, "many escapes under Wisconsin law are passive."[8] Id. Most recently, the Seventh Circuit held that "a violation of 18 U.S.C. § 751(a), as a categorical matter, is not a crime of violence under the Sentencing Guidelines" because, unlike burglary or arson, one could violate the federal escape statute, which "covers a wide range of conduct, from violent jailbreaks to quiet walkaways to passive failures to report," without creating a risk of harm to oneself or to others. United States v. Hart, ___ F.3d ___, No. 07-3395, 2009 WL 2591322, at *7 (7th Cir. Aug. 25, 2009) (noting that "one can commit 'escape' under the federal statute simply by staying home on the day one is supposed to surrender").[9]

---

[8] Because the statute could be violated in a way that constitutes a crime of violence and a way that does not, and it was unclear from the record – which did not include the charging documents for Templeton's prior convictions – whether or not Templeton's convictions were for "jailbreaks or otherwise involve[d] the sort of active and aggressive conduct that Begay requires," the court remanded to the district judge to determine whether Templeton's escapes were crimes of violence. Id. at 383-84. The court noted that if Templeton's crimes did not involve purposeful, violent, or aggressive conduct as required under Begay, then his "convictions must not be classified as crimes of violence." Id. at 384.

[9] See also Pratt, 568 F.3d at 22 n.10 (recognizing a distinction between escapes from secure custody and walkaway escapes and emphasizing that its holding that an escape from secure custody is a violent felony under Begay did not necessarily extend to walkaway escapes); United States v. Mills, 575 F.3d 833, 833-34 (8th Cir. 2009) (per curiam) (reversing and

27

As previously noted, we have not addressed whether a non-violent walkaway escape is still categorically a violent felony or crime of violence after Chambers and Begay. We have, however, concluded that fleeing and eluding in violation of Florida Statute § 316.1935(2), which makes it a third-degree felony to "willfully flee[] or attempt[] to elude a law enforcement officer in an authorized law enforcement patrol vehicle . . . with siren and lights activated," is not a violent felony under the standard set forth in Begay. Harrison, 558 F.3d at 1293, 1295-96. Having characterized the crime of conviction under the Florida statute as "willfully failing to stop after a police officer signals one to do so," we concluded that it was not roughly similar to the ACCA's enumerated crimes in terms of the degree of risk posed because "the behavior underlying [the] crime, in the ordinary case, involves only a driver who willfully refuses to stop and continues driving on – but without high speed or recklessness – mak[ing] it unlikely that the confrontation will escalate into a high-speed chase that threatens pedestrians, other

---

remanding to the district court for resentencing, with instructions to review the "charging documents, plea agreement, jury instructions, or other comparable judicial records" to determine whether Mills' escape conviction was a crime of violence under § 4B1.2 in light of Chambers and Begay, after finding that the record was unclear as to whether Mills' conviction was for a walkaway escape or an "escape from a penal institution"); Charles, ___F.3d at ___, 2009 WL 2436663, at *7 (reversing defendant's sentence as a career offender and remanding to the district court for a determination of whether, in light of Chambers, defendant's "walkaway" escape conviction under 28 U.S.C. § 751(a), which covers conduct that does and does not trigger the career-offender enhancement, was a crime of violence).

drivers, or the officer." Id. at 1294.

We next found that the offense was not similar in kind to the ACCA's enumerated crimes because while purposeful, "disobeying a police officer's signal and continuing to drive on, *without high speed or reckless conduct*, is not sufficiently aggressive and violent . . . to be like the enumerated ACCA crimes." Id. at 1295 (emphasis added). Such conduct, we explained, though neither passive nor a form of inaction, is not the kind of conduct that "show[s] an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger." Id. (quotation marks and citation omitted). With these decisions as a guide, we now turn to the case before us. The record reflects that Lee was convicted under a New Jersey statute that makes it a felony offense for a person to remove himself without authorization from, or fail to return to, official detention. See N.J.S.A. § 2C:29-5(a). An offense under this subsection is a crime of the second degree "where the actor employs force, threat, deadly weapon or other dangerous instrumentality to effect the escape. Otherwise, it is a crime of the third degree." Id. § 2C:29-5(e). This statute, like the Kentucky statute in Ford, thus "proscrib[es] general departures from custody and general failures to return," Ford, 560 F.3d at 423, but also differentiates between violent and non-violent departures by separately criminalizing escapes involving the use of force

29

and placing those offenses in a separate, more serious, felony class, see Chambers,

___ U.S. at ___, 129 S. Ct. at 691 (noting that the fact that the Illinois statute "not only lists escape and failure to report separately . . . but also places the behaviors in two different felony classes . . . of different degrees of seriousness" provided further indication "that a failure to report . . . is a separate crime, different from escape"). Although grouped together within a single statutory section, violent and non-violent escapes, which describe different behaviors, are thus separate and distinct crimes under New Jersey law.[10]

There is no dispute in this case that Lee was convicted for violating the statute in the third degree based on his leaving a halfway house without permission. The question we must answer is whether Lee's non-violent "walkaway" escape is "roughly similar, in kind as well as in degree of risk posed," to arson, burglary, extortion, or crimes involving the use of explosives. Begay, 553 U.S. at ___, 128 S. Ct. at 1585. We find that it is not.

In order to be convicted of third degree escape under the New Jersey statute,

---

[10] In Templeton, the Seventh Circuit distinguished between violent and non-violent escapes, noting that "[e]scapes that entail violence (or the threat of violence) directed against a guard, or an officer attempting to recapture the escapee, are more dangerous than burglary or extortion and involve purposeful, violent, and aggressive conduct" and that some escapes thus easily could meet the standard set forth in Begay, for instance, where "a prisoner fashions a homemade knife (a shank) and uses it to injure or threaten a guard in order to get away." 543 F.3d at 382. Id. (quotation marks and citation omitted).

a person need only leave or fail to return to an unsecured area where he is supposed to remain. Given that the conduct underlying the offense does not involve the use or threat of physical force, it is unlikely to lead to escalated confrontations with law enforcement or to otherwise create a serious potential risk of physical injury to others. As the Ninth Circuit aptly observed,

> the circumstances apparent in a walkaway escape are of an entirely different order of magnitude than escapes from jails and prisons. Residents of halfway houses have certain privileges of ingress and egress, do not live behind concrete walls and barbed wire, and are not under constant surveillance by armed guards. Those who leave without returning do not pose an automatic risk of danger and therefore do not categorically raise a serious potential risk of physical harm. Thus, convictions for walkaway escape could clearly take place on the basis of conduct that did not present a serious potential risk of physical injury to another.

Piccolo, 441 F.3d at 1088 (quotation marks and citation omitted); cf. Pratt, 568 F.3d at 22 (noting that "escape from secure custody is a stealth crime that is likely to cause an eruption of violence if and when it is detected"). Further, though there is no empirical evidence in this case regarding the likelihood of physical harm to others during or as a result of a walkaway escape, at least one circuit has analyzed relevant statistical data and concluded that walkaway escapes do not pose such a risk. See Templeton 543 F.3d at 382 (citing a 2005 study finding that while "8% of escapees commit violence against guards in the process of getting away,

31

and . . . at least 6% of escapees commit violent crimes such as murder or robbery against civilians while on the lam[,] . . . walkaways produced no deaths or injuries"). In sum, we cannot conclude that a walkaway escape under N.J.S.A. § 2C:29-5(a), as ordinarily committed, involves the same degree of risk that is presented by the dangerous conduct underlying the ACCA's enumerated crimes.

Nor can we conclude that a walkaway offense under N.J.S.A. § 2C:29-5(a), while certainly "purposeful," involves the same kind of "violent" and "aggressive" conduct that characterizes the ACCA's enumerated crimes. See Ford, 560 F.3d at 425. Unlike crimes such as burglary and arson, or escape from secured custody, a walkaway escape from an unsecured halfway house does not "depend on aggression." Templeton, 543 F.3d at 382. As previously noted, an escapee need only remove himself without authorization from official detention to be convicted under N.J.S.A. § 2C:29-5(a). One could easily violate this statute "without intending or accomplishing the destruction of property or acting in an aggressive, violence-provoking manner that could jeopardize guards or bystanders." Id. at 383. A prior conviction for violating N.J.S.A. § 2C:29-5(a) thus does not "show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger." Begay, 128 S. Ct. at 1587. Accordingly, we have little difficulty concluding that, as in the case of an

individual who eludes law enforcement without engaging in reckless conduct, there is no sound reason for believing that an individual who simply departs from a halfway house, without the use or threat of force, is "cut from the same cloth as burglars, arsonists, extortionists, or those that criminally detonate explosives." Harrison, 558 F.3d at 1296. Like the eluding offense in Harrison, a walkaway "is not the type of conduct that one hears about and remarks, 'that's the kind of thing an armed career criminal would do.'" Id. at 1295.

In sum, we hold that a non-violent walkaway escape from unsecured custody is not sufficiently similar in kind or in degree of risk posed to the ACCA's enumerated crimes to bring it within § 924(e)(2)(B)(ii)'s residual provision. To hold otherwise would render our decision in Harrison an anomaly; if continuing to drive a motor vehicle without reckless conduct or high speed after being ordered by law enforcement to stop is not roughly similar in kind or degree of risk posed to the ACCA's enumerated crimes, then neither is merely walking away without permission from a halfway house that lacks physical barriers. See Piccolo, 441 F.3d at 1088 (finding that court's previous holding that a prior conviction for attempting to elude a police vehicle, which "involved close physical confrontation under circumstances leading to a much greater possibility of violence than walkaway escape," did not constitute a crime of violence, "resolv[ed], a fortiori,

33

that a walkaway escape is not a crime of violence").[11]

### III. CONCLUSION

Lee appeals his conviction on the grounds that the district court erred in denying his motions to suppress and for a new trial. He further challenges his fifteen year mandatory minimum sentence as an armed career criminal on the grounds that he does not have three prior violent felony convictions. We conclude that Lee lacks standing to challenge the search leading to the discovery of the firearm and that the district court's instructions to the jury were not inaccurate, misleading, or coercive. Accordingly, we AFFIRM his conviction under 18 U.S.C. § 922(g). Because Lee's escape conviction is not a violent felony under 18 U.S.C. § 924(e)(2)(B)(ii), we VACATE his sentence and REMAND to the district court for resentencing consistent with this opinion.

**AFFIRMED in part, and VACATED and REMANDED in part.**

---

[11] Because we conclude that Lee's escape offense is not a violent felony and remand for resentencing on that basis, we need not address his eluding and conspiracy convictions.