# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-2949

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TODD A. TEMPLETON,

*Defendant-Appellant*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-CR-18-C—**Barbara B. Crabb**, *Chief Judge*.

_____

ARGUED APRIL 16, 2008—DECIDED SEPTEMBER 9, 2008

_____


Before EASTERBROOK, *Chief Judge*, and WOOD and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Although the principal issue
in this appeal concerns the scope of the career-offender
sentencing guideline after *Begay v. United States*, 128 S. Ct.
1581 (2008), Todd Templeton begins with a challenge to
his conviction. When pleading guilty to two bank robber-
ies, 18 U.S.C. §2113, Templeton reserved the right to
challenge the seizure of evidence from his car. See Fed. R.

Crim. P. 11(a)(2). The district judge denied his motion to suppress the evidence, and properly. Templeton threatened to shoot a teller during the first robbery. Police knew that Templeton was their man because both his mother and his ex-wife told them that he had robbed the bank. When the police saw a pellet-gun wrapper in his car, they had probable cause to believe that the car contained a weapon, if not loot. See *Illinois v. Gates*, 462 U.S. 213 (1983). Templeton thinks that the police should have disregarded his statement to the teller. Maybe he was lying about having a gun, but the police were entitled to find out. The threat, the wrapper in plain view, and Templeton's ownership of the car were enough to supply probable cause to believe that it contained evidence. (In light of *Carroll v. United States*, 267 U.S. 132 (1927), and its successors, Templeton does not argue that a warrant was required.)

Templeton was sentenced to 235 months' imprisonment as a career offender. Congress has required the Sentencing Commission to ensure that such a criminal is sentenced at or near the statutory maximum. 28 U.S.C. §994(h). A person is a career offender when "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and . . . the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. §4B1.1.

> (a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year,

that—(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. §4B1.2. Templeton acknowledges that bank robbery, his "instant offense of conviction", is a crime of violence. He argues, however, that he does not have "two prior felony convictions of either a crime of violence or a controlled substance offense."

Templeton had been convicted of four felonies before the robberies: escape from prison (twice), failing to report to jail, and drunk driving. Under this circuit's precedents, each of these offenses is a "violent felony" for the purpose of 18 U.S.C. §924(e). See *United States v. Franklin*, 302 F.3d 722 (7th Cir. 2002) (escape); *United States v. Golden*, 466 F.3d 612 (7th Cir. 2007) ("escape" by failing to return from furlough, or failure to report for imprisonment); *United States v. Sperberg*, 432 F.3d 706 (7th Cir. 2005) (felony drunk driving). Section 924—a part of the Armed Career Criminal Act—defines "violent felony" in the same way as §4B1.2 defines "crime of violence", and we interpret §4B1.2 in the same way as §924(e). See *United States v. Upton*, 512 F.3d 394, 404 (7th Cir. 2008); *United States v. Howze*, 343 F.3d 919, 924 (7th Cir. 2003). At the time the district court sentenced Templeton, therefore, he had four convictions for crimes of violence, twice the requirement for career-offender status. But *Begay* requires us to rethink the subject.

*Begay* dealt with felony drunk driving, the subject of *Sperberg*. (Many states, including Wisconsin, treat driving while intoxicated as a felony when the driver is a recidivist or a serious injury ensues.) Drunk driving does not have the use of physical force as an element of the crime. Thus the Court asked whether drunk driving came within §924(e)(2)(B)(ii), which covers conduct "that presents a serious potential risk of physical injury to another." The Court acknowledged that drunk driving does present such a risk—but it added that not all risky activity fits within subsection (ii). Applying the *ejusdem generis* canon, the Court held that a crime comes within subsection (ii) only if it is "similar" to the offenses listed in the subsection: burglary of a dwelling, arson, extortion, and the use of explosives. The Court thought that these crimes have in common "purposeful, 'violent,' and 'aggressive' conduct." *Begay*, 128 S. Ct. at 1586. Drunk driving may be intentional, but it is not intentionally violent or aggressive and so does not fit, the Court held.

Perhaps *Begay* has broken the link between §924(e) and §4B1.2. The Court noted that §924 is part of the Armed Career Criminal Act, which implies a focus "upon the special danger when a particular type of offender—a violent criminal . . ."—possesses a gun. *Begay*, 128 S. Ct. at 1587. Section 4B1.1, the "career offender" guideline, does not single out armed criminals. Nevertheless, the Court interpreted the words of §924(e), which the Sentencing Commission repeated verbatim in §4B1.2. It would be inappropriate to treat identical texts differently just because of a different caption. This means—as the prosecutor conceded in a post-argument memorandum—that

Templeton's conviction for drunk driving is not a "crime of violence" under §4B1.2.

Whether *Begay* affects the classification of Templeton's other convictions is a harder question. Our pre-*Begay* approach to escapes, and similar offenses, asked whether a particular crime posed a significant risk of physical injury. Even before *Begay*, we had expressed some doubt about the affirmative answer that our initial decisions had given on the basis of armchair empiricism. Escapes may well lead to injuries—either when the prisoner makes the bid for freedom or when he is recaptured (escape is a continuing offense, so the risks of recapture are properly included in the calculus). But when a statute inquires into risk, data trump judicial guesses.

> [I]t is an embarrassment to the law when judges base decisions of consequence on conjectures, in this case a conjecture as to the possible danger of physical injury posed by criminals who fail to show up to begin serving their sentences or fail to return from furloughs or to halfway houses.

*United States v. Chambers*, 473 F.3d 724, 726 (7th Cir. 2007). *Chambers* announced that our classification of escapes was provisional and would be reexamined if data could be assembled. Estimates may be essential and must suffice when data are unavailable or inconclusive (as crime statistics often are), and a statutory classification such as the one in §924(e)(2)(B)(i) always prevails. But when the legislature requires judges to assess "risk", as §924(e)(2)(B)(ii) does, provisional estimates must yield to better sources of knowledge.

Templeton hired an expert to collect and analyze statistics about escapes in Wisconsin. The expert discovered that about 11% of those convicted of felony failure to report under Wis. Stat. §946.425, and 15% of those convicted of escape under Wis. Stat. §946.42(3), also are charged under one of four statutes punishing some form of resisting arrest: Wis. Stat. §946.41 (resisting or obstructing an officer), Wis. Stat. §946.415 (failure to comply with an officer's attempt to take a person into custody), Wis. Stat. §346.04 (vehicular eluding), and Wis. Stat. §940.20(2) (battery of a law officer). According to Templeton, this shows that escapes do not pose a "serious potential risk of physical injury" and so are not crimes of violence.

The problem with this argument is the assumption that a 11% to 15% chance of violent resistance to recapture does not create a "serious" risk. Drawing on the approach to burglary's risks in *Taylor v. United States*, 495 U.S. 575 (1990), we held in *Howze* that a 2% incidence of injury from a crime renders the risk "serious." That's another example of *ejusdem generis*. Section 924(e)(2)(B)(ii) gives residential burglary as an example of a crime that creates the level of risk that Congress deemed sufficient. Burglary rarely leads to physical injury; a careful burglar tries to ensure that no one is at home before breaking in. But sometimes the burglar is mistaken, and on other occasions the owner comes home while the burglary is in progress. Then there may be a confrontation and an injury. The Supreme Court has held that even attempted burglary creates a serious potential risk of violence. *James v. United States*, 127 S. Ct. 1586 (2007). Crimes that create

roughly the same magnitude of risk as burglary satisfy §924(e)(2)(B)(ii).

True, the numbers Templeton reports are not conclusive. Not every episode of resisting arrest results in injury. The rate of injury from escapes and failures to report equals the fraction of escapes resulting in resistance on apprehension (or a confrontation on departure) times the fraction of those occurrences that end in physical injury. Unless every incident of resisting arrest leads to injury, the percentage of escapes that result in injury could be less than what Templeton reports. Not every escapee is caught or charged, further reducing the first fraction. At the same time, some risk-creating acts on departure or recapture may go uncharged; other forms of violence may accompany an escape. Still other escapes may be overcharged: That an indictment alleges forceful resistance to arrest does not establish that violence occurred. Thus the actual rate of injury from escapes could be higher or lower than the 11% to 15% range.

A little independent research using data compiled by the Department of Justice shows lower rates of injury. For 1993, of 802 escapes from prison, 5 ended in death and 33 in injury. Three of the deaths, and 13 of the injuries, were to the prisoner, so the risk to guards and bystanders was about 2.7%. (The statute speaks of risk to "another", so harm to the offenders must be disregarded.) In 1984 there were 893 escapes, leading to the deaths of 8 guards or bystanders, and 6 injuries, for 1.6% risk. See United States Department of Justice National Criminal Justice Referral Service, *Survey: Escapes from Correctional Facilities*, 10

Corrections Compendium 11–15 (1986); *Prison Escapes and Violence Remain Down*, 19 Corrections Compendium 6–21 (1994). A recent comprehensive study gives higher rates. Richard F. Culp, *Frequency and Characteristics of Prison Escapes in the United States: An Analysis of National Data*, 85 Prison J. 270 (2005), concludes that 8% of escapees commit violence against guards in the process of getting away, and that at least 6% of escapees commit violent crimes such as murder or robbery against civilians while on the lam. By contrast, walkaways produced no deaths or injuries.

These numbers show that escapes (other than walkaways) generate a sufficient risk of injury to count as crimes of violence. See also *United States v. Billups*, No. 07-2037 (7th Cir. July 29, 2008) (false imprisonment creates a serious risk of injury and must be treated as a crime of violence on that account). *Chambers* observed that judges should rely on data rather than conjecture. Even if data do not perfectly describe the actual injury rate, they let us estimate the rate with more confidence than before.

Readers of this opinion are entitled to wonder at this point why we have bothered to evaluate the risk from escape and failure to report for custody. After all, *Begay* holds that risk is insufficient—but although risk of injury is insufficient, it is *necessary* if the offense in question is sufficiently "like" the list (burglary, arson, extortion, and the use of explosives) to pass the *ejusdem generis* filter. Shortly after deciding *Begay*, the Court granted certiorari in *Chambers*, 128 S. Ct. 2046 (2008), and set that case for

plenary review rather than remanding for reconsideration in light of *Begay*. The data gathered in this case permit us to fill the empirical void that *Chambers* noted and may facilitate the Supreme Court's decision. But *Begay* also shows that this court's approach in *Chambers* and earlier cases was incomplete, because we did not ask whether escapes and failures to return are sufficiently similar to the listed offenses.

It isn't hard to see how *some* escapes could meet the standard laid down in *Begay*. If a prisoner fashions a home-made knife (a shank) and uses it to injure or threaten a guard in order to get away, the escape will meet the Court's standard. Escapes that entail violence (or the threat of violence) directed against a guard, or an officer attempting to recapture the escapee, are more dangerous than burglary or extortion and involve "purposeful, 'violent,' and 'aggressive' conduct" (*Begay*, 128 S. Ct. at 1586).

The problem is that many escapes don't depend on aggression. A furloughed prisoner's failure to return is a form of escape. So is a prisoner's walkaway from a halfway house or a camp that lacks fences. We know from *Taylor* and *Shepard v. United States*, 544 U.S. 13 (2005), that to classify a crime under §924(e) we must look at how an offense is defined by statute, not at what the offender did in fact. See also *United States v. Shannon*, 110 F.3d 382, 384–85 (7th Cir. 1997) (en banc). Here is the relevant text of Wis. Stat. §946.42, the escape offense of which Templeton was twice convicted:

> A person in custody who intentionally escapes from custody under any of the following circum-

> stances is guilty of a Class H felony: (a) Pursuant to
> a legal arrest for, lawfully charged with or con-
> victed of or sentenced for a crime.
>
> . . .
>
> "Custody" includes . . . the constructive custody of
> persons placed on supervised release . . . or . . .
> temporarily outside the institution whether for the
> purpose of work, school, medical care, a leave
> granted under s. 303.068, a temporary leave or
> furlough granted to a juvenile, or otherwise.
>
> . . .
>
> "Escape" means to leave in any manner without
> lawful permission or authority.

The definition includes prisoners let out for a specific purpose who do not return as instructed, cf. *Wisconsin v. Magnuson*, 233 Wis. 2d. 40, 606 N.W.2d 536, 540–41 (2000), or who leave unsupervised confinement, such as house arrest, Wis. Stat. §302.425(6). Wisconsin allows prisoners to leave certain forms of confinement temporarily "for employment, education or other rehabilitative activities." Wis. Stat. §301.046(5). If a prisoner intentionally fails to return from this furlough, he is guilty of escape without so much as moving a muscle. See Wis. Stat. §302.425(6).

A walkaway is not a crime of violence under *Begay*. Nor is a simple failure to report to custody, which violates Wis. Stat. §946.425. These offenses do not involve "aggressive" conduct against either a person (as in extortion) or property (arson). All the Wisconsin statute requires is that the escapee "leave". The crime does not require any violent or

aggressive act. Although the statute does require intent, the required mental state is only intent to be free of custody, not intent to injure or threaten anyone. It is easy to violate Wis. Stat. §946.42 without intending or accomplishing the destruction of property or acting in an aggressive, violence-provoking manner that could jeopardize guards or bystanders.

It will not do to argue, as the prosecutor does, that escape is enough like burglary to make it a crime of violence. Doubtless for both crimes there is a chance the criminal will confront another person with violent results: the building's occupant for burglaries and the guards or police for escapes. But *Begay* requires the crime to be aggressive or violent. All the prosecutor identifies is a common result: in both cases injuries may follow confrontations. *Begay* requires similarities *other* than risk of injury. That's why *Begay* held that drunk driving is not a "violent felony" despite the substantial risk of injury that ensues.

Nor does the fact that both crimes contain an intent element render them similarly violent. Burglary requires both the intent to enter a building *and* the intent to commit a crime once inside. This second intent is what makes burglary "purposeful, 'violent,' and 'aggressive'" in all cases. It involves intentionally encroaching on another's property or person, or intentionally injuring another's property or person. By contrast, many escapes under Wisconsin law are passive.

So it is possible to violate Wis. Stat. §946.42 in a manner that constitutes a crime of violence under §4B1.1, and

possible to do so in a way that is not. *Taylor* holds that when a state statute can be violated in a way that is, or is not, the basis of federal recidivist treatment, a court may look at the indictment or other charging papers to determine in what way the defendant committed the offense. For other illustrations of this principle, see *Shannon*, *Howze*, *Flores v. Ashcroft*, 350 F.3d 666 (7th Cir. 2003), and *United States v. Spells*, 2008 U.S. App. LEXIS 16861 at *10–28 (7th Cir. Aug. 8, 2008). The record does not contain the charging papers for Templeton's prior convictions. (They were not essential under this court's pre-*Begay* decisions; neither counsel nor the district judge can be faulted for failing to include them.) A remand therefore is necessary to determine whether Templeton's escapes are crimes of violence. Because Templeton has two prior convictions for escape, he can still qualify as a career offender under §4B1.1.

The district judge should find out—if the charging papers and other documents that may be considered under *Taylor* and *Shepard* reveal this fact—whether the crimes of which Templeton was convicted are jailbreaks or otherwise involve the sort of active and aggressive conduct that *Begay* requires. If not, or if the issue was not addressed by the charging papers and equivalent documents, then the convictions must not be classified as crimes of violence.

We must address one last issue before closing. Both the prosecutor and Templeton have asked us to hold this appeal for the Court's decision in *Chambers*. But the data in this record allow an evaluation of risk in a way that the

record in *Chambers* did not. It seems best for this circuit to state its current understanding of not only the risk of these crimes but also the way that *Begay* affects our precedents. If we have misunderstood *Begay*, the Supreme Court will tell us. In the meantime the substantial volume of prosecutions that present issues under §924(e) or §4B1.1 can be resolved.

Templeton's conviction is affirmed. His sentence is vacated, and the case is remanded for further consideration in light of this opinion.