RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                       *Plaintiff-Appellee*,

                            No. 10-6163

     *v.*

BENJI ANTONIO STOUT,
                     *Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:09-cr-147-2—Karen K. Caldwell, District Judge.

Argued: July 26, 2012

Decided and Filed: February 5, 2013

Before: COLE and DONALD, Circuit Judges; SARGUS, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Jeffrey A. Darling, REINHARDT & ASSOCIATES, PLC, Lexington, Kentucky, for Appellant. Valorie D. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Jeffrey A. Darling, REINHARDT & ASSOCIATES, PLC, Lexington, Kentucky, for Appellant. Valorie D. Smith, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

     SARGUS, D. J., delivered the opinion of the court, in which COLE, J., joined. DONALD, J. (pp. 10–20), delivered a separate dissenting opinion.

_____

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

OPINION

———————————

EDMUND A. SARGUS, District Judge.  Benji Stout pleaded guilty to knowingly possessing body armor after having been previously convicted of a crime of violence, in violation of 18 U.S.C. § 931(a)(2).  Stout now appeals, contending that the district court erred when it found that his prior state-law conviction for second-degree escape constituted a "crime of violence," as defined by 18 U.S.C. § 16.  For the following reasons, we **AFFIRM** the decision of the district court.

**I.**

On August 4, 2009, officers from the Winchester, Kentucky Police Department stopped Stout's vehicle.  The officers discovered four pieces of body armor in the vehicle, which Stout admittedly possessed.  The body armor had been manufactured by American Body Armor in Jacksonville, Florida and sold in interstate commerce prior to Stout's possession.

A grand jury returned an indictment charging Stout with one count of being a felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one count of knowingly possessing body armor after having been previously convicted of a crime of violence in violation of 18 U.S.C. § 931(a)(2).  At his arraignment, Stout requested a hearing to determine whether his prior state-law conviction for second-degree escape constituted a "crime of violence."

The record below provides limited information with regard to Plaintiff's prior state-law conviction.  In November 2004, Stout pleaded guilty to second-degree escape in violation of section 520.030 of the Kentucky Revised Statutes.  The underlying complaint alleged that Stout committed the crime while incarcerated at the Detention Center in Lincoln County, Kentucky.  According to the reporting officer, Stout "scaled the recreation area wall, cutting a hole in the fence at [the] top and escaping custody of the [j]ail."  During the evidentiary hearing, Stout, through his attorney, admitted to

scaling the wall and escaping through a hole in the fence, but denied cutting the hole in the fence. The government proffered no evidence indicating that Stout was the individual who cut the hole in the fence that he used for his escape. On this basis, the district court "assume[d] that [Stout] merely used the hole to make his escape."

The district court held that Stout's prior state-law conviction for escape constituted a "crime of violence" for purposes of 18 U.S.C. § 16. The district court stressed that Stout had escaped from a secure facility, by scaling a fence. The district court reasoned that Stout's actions were "purposeful and aggressive" and "created a serious risk of the use of physical force against guards and members of the general public." After the district court's ruling, Stout pleaded guilty to one count of knowingly possessing body armor having previously been convicted of a "crime of violence." The government, through motion, dismissed the other remaining charge, being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Stout's plea agreement allowed him to appeal the district court's ruling on the "crime of violence" issue. Accordingly, he filed a timely notice of appeal of his conviction.

## II.

Stout's appeal presents a single issue: Does his prior state-law conviction for escape constitute a "crime of violence" within the meaning of 18 U.S.C. § 16? We review the district court's legal determination *de novo*. *United States v. Martin*, 378 F.3d 578, 580 (6th Cir. 2004).

A "crime of violence" is defined as:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16 (2006).  Our inquiry is conditionally two-fold.  First, we apply the "categorical approach" to discern the nature of a defendant's prior conviction.  *Taylor v. United States*, 495 U.S. 575, 602 (1990).  To do so, we look to the statutory definition of the crime of conviction, not the underlying facts thereof, to determine the nature of the crime.  *Id.*; *see also Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) (holding that the language of 18 U.S.C. § 16 "requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime").  If, however, this inquiry reveals that it is possible to violate a criminal law both in a manner that is a crime of violence and in a manner that is not, we may look at the indictment, guilty plea, and similar documents to see if they "necessarily" establish the nature of the prior offense.  *Shepard v. United States*, 544 U.S. 13, 26 (2005); *see also United States v. Mendoza-Mendoza*, 239 F. App'x 216, 219 (6th Cir. 2007) (applying *Shepard* within the context of 18 U.S.C. § 16).

In evaluating the residual clause of § 16(b), we recognize that the United States Sentencing Guidelines and the Armed Career Criminal Acts ("ACCA") each contain similar residual clauses relating to crimes of violence.  *See* U.S. Sentencing Guidelines Manual § 4B1.2 (2012) (providing that the term "crime of violence" includes a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another"); 18 U.S.C. § 924(e)(2)(B) (stating that "violent felony" includes a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another").  Although similar, the language of § 16(b) is narrower than these provisions to the extent that it explicitly requires that a crime carry a  substantial risk "of physical force" during "the course of committing the offense."  18 U.S.C. § 16(b); *see also United States v. Amos*, 501 F.3d 524, 527–28 (6th Cir. 2007) (comparing § 16(b) to the ACCA).

**III.**

Pursuant to the approach outlined in *Taylor* and *Shepard*, we must first classify the offense in question.  We have recognized, "[o]ften the key analytical move in the case happens at the first step: deciding whether the state-law definition of the offense involves just one category or two or more categories of crimes."  *United States v.*

*Mosley*, 575 F.3d 603, 606 (6th Cir. 2009).  "The 'categorical approach requires courts to choose the right category,' as the Supreme Court recently clarified, and sometimes that choice requires the federal courts to draw distinctions that the state law on its face does not draw."  *Id.* (quoting *Chambers v. United States*, 555 U.S. 122, 126 (2009)).  For example, when the same statutory section criminalizes two types of behavior that significantly differ, "a sentencing court must treat the two as different crimes." *Chambers*, 555 U.S. at 126.  At the same time, however, we must be "careful that the lines we draw are meaningful ones" and must not circumvent the categorical approach that *Taylor* requires.  *United States v. Ford*, 560 F.3d 420, 424 (6th Cir. 2009).

As detailed above, Stout's prior state-law conviction was for escape.[1]  Under Kentucky law, "escape in the first degree" is a Class C felony that arises when a person "escapes from custody or a detention facility by the use of force or threat of force against another person."  Ky. Rev. Stat. § 520.020 (2012).  This was not, however, the crime of Stout's conviction.  Stout was guilty of escape in the second degree, which consists of either "escape[] from a detention facility or, [while] being charged with or convicted of a felony, . . . escape[] from custody."  *Id.* § 520.030(1).

To categorize section 520.030 of the Kentucky Revised Statutes, we need not look far.  In *Ford*, we acknowledged that "a conviction for second-degree escape [under this provision] covers everything from a felon who breaks out of a maximum-security prison to one who fails to report at a halfway house."  560 F.3d at 422.  Because of the broad range of conduct that a conviction for second-degree escape covers, we concluded that there were both violent and non-violent means of violating the statute.  *Id.* at 426.  Moreover, we recognized that Kentucky law divides "into at least four categories of escape: leaving custody with the use or threat of force; leaving custody in a secured

---

[1]Prior to the Supreme Court's decision in *Chambers*, the Sixth Circuit had taken the view that all escape offenses—from failure to report at one end of the spectrum, to a breakout at the other—constituted crimes of violence.  *See, e.g.*, *United States v. Bailey*, 510 F.3d 562, 566 (6th Cir. 2007).  In *Chambers*, the Supreme Court held that at least one type of escape conviction under Illinois law—a "failure to report for penal confinement"—is not a "violent felony" under the ACCA.  555 U.S. at 123.  Following *Chambers*, we held in *Ford* that a "walkaway" escape is not a crime of violence within the meaning of the sentencing guidelines.  560 F.3d at 426.

setting; leaving custody in a non-secured setting by 'walking away'; or failure to report."
*Id.* at 424.

In this case, the proper classification of Stout's offense is an escape by leaving custody in a secured setting. Once again, within the relevant *Shepard* material, Stout admits that he scaled the recreational area wall of his detention facility and then escaped through a pre-existing hole in the fence. Such conduct falls squarely into the category of "leaving custody in a secured setting" that we recognized in *Ford*. *Id.* at 424. Specifically, in *Ford*, we discussed the differing nature of such conduct in comparison to walkaway escapes:

> There is a difference between individuals who overcome physical barriers to freedom and those who walk off the grounds-those in other words who leave a facility without removing a physical restraint, without breaking a lock on a door, *without climbing over a prison wall or security fence* or without otherwise breaking through any other form of security designed to keep them put.

*Id.* (emphasis added).

At least within the circumstances of this case, we will not further divide the categories of section 520.030 of the Kentucky Revised Statutes outlined in *Ford*.[2] There are various ways in which a person might escape from custody in a secured facility, with varying degrees of culpability. Nevertheless, the Court must not abandon a categorical approach. Here, the category of leaving a secured setting "describe[s] roughly similar forms of behavior" that "amount to variation on a single theme." *See Chambers*, 555 U.S. at 127 (holding that although there were "various kinds of failure to report" under the relevant statute, failure to report "constitut[ed] a single category"). As suggested in *Ford*, escapes within this category involve purposeful action to "overcome physical barriers to freedom." 560 F.3d at 424. Additionally, as our sister circuits have recognized, escapes from secured facilities are similar in nature as they involve the use of stealth as well as the possibility of detection. *See, e.g.*, *United States v. Furqueron*,

_____

[2]This is not to say that there are no other possible divisions, outside the four categories *Ford* listed, of section 520.030 of the Kentucky Revised Statutes. As detailed above, however, Stout's conduct in scaling a jail wall clearly falls within the category of leaving the custody of a secured setting.

605 F.3d 612, 615 (8th Cir. 2010); *United States v. Pratt*, 568 F.3d 11, 22 (1st Cir. 2009).

## IV.

Having classified Stout's offense, we must now determine whether it constitutes a "crime of violence." The use or threatened use of physical force is not an element of an escape from a secured facility and, therefore, 18 U.S.C. § 16(a) does not apply. Accordingly, the question becomes whether escaping from a secured facility "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b).

As the Supreme Court has stated, "[§ 16(b)] covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal*, 543 U.S. at 10. Moreover, giving the terms of § 16(b) their ordinary meaning, crimes of violence are "active crimes." *Id.* at 11; *see also Johnson v. United States*, 130 S.Ct. 1265, 1271 (2010) (indicating that the term violent "connotes a substantial degree of force"). The Supreme Court has provided that burglary is the "classic example" of a crime of violence under § 16(b). *Leocal*, 543 U.S. at 10. In particular, "a burglary would be covered under § 16(b) not because the offense can be committed in a generally reckless way or because someone may be injured, but because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime." *Id.*

Applying these guidelines, escape from a secured facility is a crime of violence within the meaning of 18 U.S.C. § 16(b). Escape from a secured facility is an active crime, requiring intentional conduct on the part of the offender. As we implied in *Ford*, such escapes involve individuals overcoming physical barriers, as well as security, and are the type of "traditional escapes . . . apt to lead to serious risks of physical injury." 560 F.3d at 424. Moreover, the risk involved is not simply accidental injury, but includes the risk that the offender will use physical force against others and their property in the course of committing the offense. Leaving a secured facility comes with the clear possibility of detection and confrontation during the course of the escape.

Given the unique intensity of a jailbreak scenario, it is natural to infer a significant risk that the offender will be prone to use force against any person, or property, interfering with completion of the crime. *See, e.g.*, *Pratt*, 568 F.3d at 22 ("[E]scape from secure custody is a stealth crime that is likely to cause an eruption of violence if and when it is detected."); *cf. United States v. Hughes*, 602 F.3d 669, 677 (5th Cir. 2010) ("[T]he act is typically aggressive insofar as one who escapes prison is no doubt aware that armed law enforcement will seek him out, potentially ending in a violent confrontation."). In other terms, given the serious consequences that result from capture, it is likely that many offenders will not simply give up their escape if they encounter security.

Furthermore, escape from a secure facility is similar to burglary, the classic crime of violence pursuant to § 16(b). *See, e.g.*, *United States v. Proch*, 637 F.3d 1262, 1268–69 (11th Cir. 2011) (concluding that escape from custody is similar to burglary); *Furqueron*, 605 F.3d at 615–16 (same). Both crimes involve stealth and the possibility of detection. These characteristics, combined with the serious nature of both crimes, lead to the substantial risk that the offender will resort to violence if confronted prior to the completion of the crime.

Tellingly, in light of statistical data, the Seventh Circuit has found "that escapes (other than walkaways) generate a sufficient risk of injury to count as crimes of violence." *United States v. Templeton*, 543 F.3d 378, 382 (7th Cir. 2008) (citing a study reflecting "that 8% of escapees commit violence against guards in the process of getting away"). We also recognize that other circuits have concluded that escape from a secured facility is a crime of violence or violent felony within similar contexts. *See, e.g.*, *Proch*, 637 F. 3d at 1269 (holding that escape from jail was a violent felony under the ACCA); *Hughes*, 602 F.3d at 676–77 (same); *Pratt*, 568 F.3d at 22 ("[E]scape from secure custody, by crawling under a fence at a county jail, was a 'violent felony' within the meaning of the ACCA"); *see also Furqueron*, 605 F.3d at 616 (holding that escape from a penal institution was a crime of violence within the meaning of the sentencing guidelines).

Finally, in concluding that escape from a secured facility is a crime of violence under 18 U.S.C. § 16(b), we are not attempting to revive an expansive "powder-keg" approach. Prior to *Chambers*, various holdings of this and other circuits "turned on the reasoning that every escape scenario is a powder keg because [a] defendant who escapes from jail is likely to posses a variety of supercharged emotions and violence could erupt at any time." *United States v. Anglin*, 601 F.3d 523, 529 (6th Cir. 2010). Courts used this rationale to designate walkaway escapes as violent crimes based on the potential of what might happen if the offender was eventually caught. *Id.* Following *Chambers* and *Ford*, we recognized that "the powder-keg theory has little, if any, continuing persuasiveness." *Id.* Our holding today is not based on broad speculation as to future events that might occur after the crime. Rather, it is based on the substantial risk that offenders who choose to escape from secured settings will engage in physical violence *during the course of the escape*. This is exactly the type of analysis that 18 U.S.C. § 16(b) requires.

## V.

For these reasons, we **AFFIRM** the decision of the district court.

———————————

**DISSENT**

———————————

BERNICE BOUIE DONALD, Circuit Judge, dissenting.  Benji Stout is no Edmond Dantès, who famously escaped from prison by cutting open a body bag with an improvised knife and hiding in the bag, to be flung unknowingly into the sea by gravediggers. *See* Alexander Dumas, *The Count of Monte Cristo* 172-75 (David Coward ed., Oxford University Press 1990) (1845).  Nor is he Andy Dufresne, who slowly chiseled his way to freedom and destroyed a sewer pipe in effectuating his escape. *See The Shawshank Redemption* (Castle Rock Entertainment 1994).  I would have no quarrel with the conclusion that either of their escapes would be a "crime of violence" for our purposes today.

Instead, an unarmed Stout climbed a wall and crawled through a hole in a prison gate that he was not responsible for creating.  Because the law and common sense compel me to fundamentally disagree with the majority's conclusion that such acts are "crimes of violence," I must respectfully dissent.

I.

Simply put, I disagree with the proposition that our decision in *United States v. Ford*, 560 F.3d 420 (6th Cir. 2009), applies here today.  The primary basis for my disagreement is this:  we are dealing with an entirely different statute. Section 16 and the ACCA's violent felony provision are separate legislative creatures, deserving of separate analyses.[1]

I begin at the place where all federal laws find their beginning:  Congress.  Our legislature selected § 16 as the basis for determining which violent crimes would serve as a predicate offense making the possession of body armor illegal. *See* H.R. Conf. Rep. 107-685 § 11009 (2002).  By cross-referencing § 16, Congress sought to have the statute

_____

[1]Like the majority, I posit that the ACCA's residual clause and section 4B1.2 of the Sentencing Guidelines should be read *in pari materia*.  Because I have no need to draw distinctions between the two, I will refer only to the ACCA's provisions.

operate in tandem with existing drug-trafficking weapons possession statutes. *See* 18 U.S.C. § 924(c)(3) (2000). In doing so, it impliedly opted not to adopt another definition of "violent felony" that was already on the books—the ACCA's. *See* 18 U.S.C. § 924(e)(2)(B) (2000). We must be mindful of the distinction that Congress drew when it eschewed one for the other. To conflate the two statutes, as the majority does today, is to disregard the careful contemplation the legislature undertook in writing the statute the way it did. *Cf. Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979).

Looking to the statutes themselves may be helpful in illustrating the difference between the two. Section 16 provides:

> The term "crime of violence" means–
>
> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used *in the course of committing the offense.*

18 U.S.C. § 16 (2006) (emphasis added). In contrast, the violent felony provision of the ACCA provides, in pertinent part:

> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year . . . that—
>
>> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>>
>> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct *that presents a serious potential risk of physical injury to another. . . .*

*Id.* § 924(e)(2) (emphasis added). I doubt anyone could validly posit that § 16(a) and § 924(e)(2)(B)(i) apply to section 520.030 of the Kentucky Revised Statutes, so I will proceed by discussing only § 16(b) and § 924(e)(2)(B)(ii).

I derive two points of significance in comparing the residual clauses of the two statutes. First, § 16(b) is *temporally* constrained, whereas § 924(e)(2)(B)(ii) is not: the substantial risk of physical force must arise "*in the course of* committing the offense."

In contrast, § 924(e)(2)(B)(ii) merely requires conduct "that presents a serious potential risk of physical injury to another." Second, § 16(b) is *contextually* constrained in two ways: (a) the use of physical force must arise from the "course of" committing the offense, i.e., in order to effectuate the offense; and (b) the person who may potentially use physical force must be the offender. Section 924(e)(2)(B)(ii) has neither facial constraint.[2]

These are not novel distinctions. This court has previously recognized that § 16(b) is constrained in a manner that the ACCA is not. *See United States v. Amos*, 501 F.3d 524, 527 (6th Cir. 2007) ("The clause 'used in the course of committing the offense,' which does not appear in the ACCA, narrows the section 16(b) definition and distinguishes it from that in the ACCA."). Indeed, my colleagues on the court, writing separately, have stressed the importance of distinguishing the two statutes. *See id.* at 530 (Batchelder, J., concurring) ("18 U.S.C. § 16 . . . is not identical to [18 U.S.C. § 924(e)(2)(B)."); *id.* at 531, 533-34 (McKeague, J., dissenting) (criticizing the reliance on *Leocal* and § 16 in an ACCA violent felony case).

On the surface, the majority appears to recognize that we are addressing a different statute, but its analysis suggests that it is paying little more than lip service to the nuances revealed by comparing both provisions. To make our otherwise-inapposite decision in *Ford* binding in a manner that comports with § 16, my colleagues rely on dicta from the Supreme Court's decision in *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the seminal case concerning § 16. They reiterate the *Leocal* Court's observation that burglaries, by their nature, "involve[] a substantial risk that the burglar will use force against a victim in completing the crime." *Leocal*, 543 U.S. at 10. They reason that "it is natural to infer a significant risk that the offender will be prone to use force against any person, or property, interfering with completion of [the escape]." (Maj. Op. at 8.) Because burglaries and jailbreaks share the common attribute of carrying some inherent

---

[2]I do not mean to suggest that a defendant, under the ACCA, would be responsible for the serious potential risk of physical injury to another *posed by* another, e.g., a police officer wounding an innocent bystander in an attempt to apprehend an escaped inmate who used improvised tools to effectuate his escape. I am merely comparing the face of the two statutes.

risk that the perpetrator will use physical force, they are alike. Thus, *Leocal* can be used to sustain *Ford*'s *obiter dicta* that scaling a prison wall or climbing through a compromised security fence, as Stout did here, is a crime of violence. Or so the reasoning of the majority goes.

I do not share my colleagues' confidence that the law supports such contortion. First, the reliance on *Leocal*'s dicta on burglaries is misplaced—or at the very least, out of context. A burglary, like certain other crimes, is categorically *sui generis*: it is one of several crimes that are so latent with the potentiality of harm that Congress, as well as the courts, have recognized them to be inherently violent crimes. To complete the reference in *Leocal*, it is helpful to look at the seminal ACCA violent-felony case: *Taylor v. United States*, 495 U.S. 575 (1990).

In *Taylor*, the Supreme Court, while analyzing the legislative history of the violent felony provision, made several "useful observations" to fill in the gaps of such history. One of these observations was the fact that an offender's entry into a building "often creates the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate." *Id.* at 588. After careful review of what Congress had contemplated, the court concluded that the legislature believed "all burglaries serious enough to be punishable by imprisonment for more than a year constituted a category of crimes that shared this potential for violence." *Id.* It was this careful intertwining of legislative history and judicial reasoning that likely led to the *Leocal* Court's observation that burglary was a "classic example" of an inherently dangerous crime. *See Leocal*, 543 U.S. at 10. We have the benefit of neither to support the inference of inherence that the majority suggests with respect to escapes.[3]

Still, the lack of legislative history and extensive judicial commentary thereon does not definitively forbid the majority's attempt to bridge *Ford* with *Leocal* using inherence as a foundational pier. For that, I turn to *Ford* itself. In that case, we disavowed our *past* circuit precedent in which we deemed all escape offenses to be

---

[3]As I explain below, the "powder keg" rationale is unconvincing and foreclosed by circuit precedent.

crimes of violence.  *Ford*, 560 F.3d at 423 (emphasis added).  We surmised that, after *Chambers*, it was no longer "clear-cut."  *Id.*  The impetus for our subdividing of the Kentucky statute was the concession that not all escapes possessed the inherent potentiality of harm that seems unquestionably latent in all of the categorically *sui generis* offenses such as burglary.  In addition, the majority cannot reason that walkaways were the exception and that inherent harm should be categorically recognized for all other offenses; if that were true, we would not have sanctioned further mincing of the Kentucky escape statute.  *See id.* at 424.  Therefore, the bridge between § 16 and § 924(e)(2)(B) is an illusory one.

## II.

There is another aspect of the majority's opinion that I find conflictive with circuit precedent:  its invocation of the "unique intensity of a jailbreak scenario" to justify sustaining the "crime of violence" determination.  The powder-keg reasoning, which we have eschewed even in the context of the ACCA, seems to have made a reappearance.  My colleagues assert, in a somewhat conclusory manner, that our decision today does not rest upon the buttress of the powder keg.  I respectfully beg to differ.  Indeed, the majority's analysis seems to belie this assertion.

To justify its decision, the majority relies on cases from our sister circuits that explicitly invoke the *verboten* rationale of the powder keg.  *See United States v. Hughes*, 602 F.3d 669, 677 (5th Cir. 2010) ("It was in this sense that we termed escape a 'powder keg' in *Ruiz*, and now reaffirm our holding in that case."); *United States v. Pratt*, 568 F.3d 11, 22 (1st Cir. 2009) ("Therefore, the 'powder keg' rationale still applies to such a crime."). Notwithstanding my colleagues' protestations to the contrary, it appears that we are restocking the recently-emptied keg with fresh gunpowder.  I, however, would prefer to remain steadfast to our own circuit's decision to attribute "little, if any, continuing persuasiveness" to the powder-keg theory.  *See United States v. Anglin*, 601 F.3d 523, 529 (6th Cir. 2010).

III.

To illustrate why it is important to draw distinctions between § 16 and the ACCA, I now address *Ford* itself, particularly the passage that has led to my quandary today. In *Ford*, we opined that:

> There is a difference between individuals who overcome physical barriers to freedom and those who walk off the grounds—those in other words who leave a facility without removing a physical restraint, without breaking a lock on a door, *without climbing over a prison wall or security fence* or without otherwise breaking through any other form of security designed to keep them put.

560 F.3d at 424 (emphasis added). I note that, since *Ford*, the Supreme Court held in *Johnson v. United States*, 130 S. Ct. 1265 (2010), that violence under the ACCA and § 16 must "connote[] a substantial degree of force." *Id.* at 1271. Keeping this in mind, it is not farfetched to say that climbing a wall or crawling through an open hole does not ordinarily involve a "substantial degree of force," as *Johnson* requires. Thus, to deem such an escape "violent" for purposes of the ACCA, there must be some conduct outside of the climbing or crawling itself that must pose a "substantial risk" of the use of physical force against a person or property.

This is where the distinction between § 16 and the ACCA's "violent felony" provision creates a deviation of disposition. It may very well be true, as the *Ford* court's reliance on the Seventh Circuit's decision in *United States v. Templeton*, 543 F.3d 378 (7th Cir. 2008) suggests, that a wall-climbing inmate will "commit violent crimes such as murder or robbery against civilians while on the lam." *Ford*, 560 F.3d at 424. It may also be true that a wall-climbing inmate is "significantly more likely than others to attack, or physically to resist," law enforcement attempting to apprehend him and return him to the detention facility. *Id.* at 425. In the realm of the ACCA, it is perfectly acceptable to take these considerations into account, as the violent felony provision requires only that the conduct "present[] a serious potential risk of physical injury to another." *See* 18 U.S.C. § 924(e)(2)(B)(ii).

Not so under § 16.  As I explain above, that provision constrains us both temporally and contextually.  For Stout, this means we should only consider the risk that arises from his escape standing alone, not the risk arising from events that may occur subsequent to his escape, including his apprehension.  These limitations would not exist under the ACCA, which is why *Ford*'s dicta would be tenable in that context.

Moreover, the *Ford* decision undeniably rested on the broad swath of empirical evidence evaluated in *Templeton*.  Undoubtedly, a small part of the Seventh Circuit's reasoning in that case was based on the risk of harm that emanated *during* the escape. *See Templeton*, 543 F.3d at 382.  That court observed from a 2005 study that "8% of escapees commit violence against guards in the process of getting away."  *Id.*  Indeed, our majority recognizes and relies upon this datum.

What my colleagues do not reveal, however, is the data that can permissibly be considered under the ACCA but not under § 16(b), in light of the latter's statutory constraints—in other words, the core of what made *Ford* possible.  Because § 16(b) requires that the risk arise from the "course of committing the offense," we cannot look to facts like the "11% to 15% chance of violent resistance to *recapture*," or the commission of "violent crimes such as murder or robbery against civilians while on the lam."  *See id.* at 381-82 (emphasis added).  Once the crime is complete, a defendant is no longer "in the course of committing the offense," and our inquiry of risk must end. Under Kentucky law, once an inmate goes beyond a secured perimeter, "his departure from the 'detention facility' [is] complete[]."  *Cope v. Commonwealth*, 645 S.W.2d 703, 704 (Ky. 1983).  When Stout stepped through the breach, his crime was complete; thus, we cannot rely on the other statistics made available by *Templeton* to sustain his conviction.

The majority, cognizant of this, invokes the lone statistic that we are permitted to consider:  that a small percentage of non-walkaway escapees engage in violent conduct as they are in the process of escaping from the facility.  *See Templeton*, 543 F.3d at 382.  This statistic, however, does not distinguish between inmates who use physical force against persons in effecting their escape, *cf.* Ky. Rev. Stat. § 520.020, inmates who

use physical force against property, *see, e.g.*, *Webster v. Commonwealth*, No. 2008-CA-000347-MR, 2009 WL 50495, at *1 (Ky. Ct. App. Jan. 9, 2009), and inmates who use neither. Put differently, we have one statistic which reveals that a fraction of *all* escapees have engaged in physical resistance in their respective attempts to illicitly obtain their freedom. Shrouded in such ambiguity, this seems inadequate to empirically support the proposition that Stout committed a crime of violence in the form of his escape. For this reason, *Ford* and its reliance on *Templeton* are not controlling here.

IV.

No dissent is complete without some explanation as to how the case should have been decided. I start with classification. The majority hints at the perplexing dilemma that this case presents: either attempt to fit the square peg of Stout's offense into one of four previously-identified categories of escape recognized under the Kentucky escape statutes or recognize a new category of offenses that would further dissect Kentucky law. Picking the right label "makes all the difference." *See Ford*, 560 F.3d at 424.

If there was ever an occasion to depart from *Ford*'s quadripartite categorization of the Kentucky escape statutes, this is it. Adopting a broad, sweeping categorization of Stout's offense that declares his crime to be one of "leaving custody in a secured setting," as the majority does, fails to capture the nuances of his offense that would otherwise suggest that his crime was not a violent one. I do acknowledge, however, that taking cognizance of a new offense category, *viz.* leaving custody in a compromised secured setting where the unarmed inmate was not the perpetrator of the breach, would put us in danger of endorsing the recognition of so many permutations of a single offense so as to render meaningless *Taylor*'s mandate that the categorical approach be applied.[4]

But I do not think it farfetched to subdivide escapes from secured facilities into sub-classifications determined by an individual's culpability in the compromising

---

[4]It appears, however, that we have not shied away from such a multitudinous approach in other contexts. *See, e.g., United States v. Kratt*, 579 F.3d 558, 563 (6th Cir. 2009) (adopting an approach requiring interpretation of 250 different predicate offenses for the money laundering statutes but nevertheless recognizing the "unsatisfying" nature of the approach).

conduct. In *Leocal*, the Supreme Court explained that the focal point of the § 16(b) analysis is not "the possibility that harm will result from a person's conduct, but . . . the risk that the use of physical force against another might be required in committing a crime." *Leocal*, 543 U.S. at 10. Because the word "use" in § 16 required "active employment," the Court surmised that "a higher degree of intent than negligent or merely accidental conduct" was required as part of the offense. *Id.* at 9. From this, the Court concluded that § 16(b) requires some *mens rea*, higher than that required for negligence, that physical force will be used in some manner.

I would therefore draw a distinction between escapes from secured custody that require some degree of knowledge, intent, or recklessness with respect to the use of physical force and escapes from secured custody that lack such *mens rea*. Stout's offense clearly falls into the latter category. There is a qualitative and categorical difference between Stout's scaling of a wall and escape through an already-compromised barrier and a prisoner's deliberate use of physical force to cause a breach in his escape. *See, e.g.*, *Webster*, 2009 WL 50495, at *1 (recalling the events leading to a section 520.030 conviction in which an inmate "cut a hole in the chain-link fence," using a "piece of steel that he had removed from the top of his cell door"). Stout certainly possessed the requisite *mens rea* to escape from prison, but to say that he exhibited an intent to use physical force to do so (or a reckless disregard thereof) by scaling a wall and crawling through an existing breach is another matter entirely.

After classifying Stout's offense, I would faithfully adhere to *Leocal*'s central premise: for an offense to be a "crime of violence" under § 16(b), it must naturally fall within a "category of violent, active crimes." 543 U.S. at 11. In its resolute focus on the "active" component of this analysis, the majority neglects the other half of *Leocal*: the crimes must be "violent." We cannot, after all, "forget that we ultimately are determining the meaning of the term 'crime of violence.'" *Id.*

Mindful of what *Johnson* said about "violence"—that it must involve "a substantial degree of force"—I cannot conclude that the manner of Stout's escape posed a risk, much less a *substantial* risk, that he would exercise such a degree of force against

the person or property of another to effectuate his escape.  The only "force" that Stout applied against the property of another was the physical exertion necessary to scale a wall and exit through an already-existing breach of the secured facility.  "In no 'ordinary or natural' sense can it be said that a person risks having to 'use'" a substantial degree of force against the property of another in doing so. *See id.* at 11.[5]

Nor could I conclude that Stout's escape posed a "substantial risk" of a "substantial degree of force" being used against the person of another.  Because Stout was an unarmed escapee, I cannot think of a rationale other than the since-eschewed powder-keg theory that could sustain such a conclusion here.  Certainly, had Stout sheathed an improvised weapon because he may have had to use it, as Dantès did, I would think differently.  Nevertheless, this was not the case.

Thus, I discern no substantial risk from Stout's offense that a substantial degree of physical force would be used against the person or property of another.  I would therefore hold that Stout's conviction under the Kentucky escape statute was not a "crime of violence" for purposes of § 16(b), and would reverse and remand with instruction to dismiss the indictment.

V.

If the law proves unpersuasive, perhaps common sense should prevail. *See Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 557 (6th Cir. 2012) (noting the Supreme Court's reliance on common sense in a commercial speech case and seeing fit to do the same).  Here are the realities of our decision today.  For climbing a wall and exiting through an open hole in a fence as an unarmed inmate-turned-escapee, Benji Stout is now deemed to have committed a crime of violence.  We are essentially sustaining Stout's conviction on a single line of dicta from a case that dealt with a different statutory scheme.  Something is missing here—perhaps it is common sense.

---

[5]I would find the degree of force used here akin to the degree of force that a walkaway might use to open a gate, jump over a ditch, or hop across a small stream.

The majority's decision to rely on *Ford* is understandable.  But it is also unreasonable.  Relying on *Ford* is tantamount to blind obeisance to a case that simply does not compel it.  The concept of dicta is a dangerous thing, and it is Stout who suffers for it.  *See Alexander v. Baltimore Ins. Co.*, 8 U.S. (4 Cranch) 370, 379 (1808) ("It is extremely dangerous to take general *dicta* upon supposed cases not considered in all their bearings, and, at best, inexplicitly stated as establishing important law principles.").

What troubles me the most, however, is the reality that we are upholding Stout's conviction on a single statistic:  that 8% of escapees commit violence against guards in the process of getting away.  We must be mindful of our longstanding legal maxim that "probability is not a guide which a court, in construing a penal statute, can safely take." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 105 (1820).  It appears that we disregard this maxim today.

For these reasons, I regretfully cannot join my colleagues in the majority and must respectfully dissent.